**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ASSURED GUARANTY MUNICIPAL CORP.,

                            Plaintiff,

      v.

RBS SECURITIES INC., RBS FINANCIAL
PRODUCTS INC., AND FINANCIAL ASSET
SECURITIES CORP.,

                          Defendants.

No. 13-CV-2019 (JGK)

---

**MEMORANDUM OF LAW OF PLAINTIFF ASSURED GUARANTY MUNICIPAL CORP.**
**IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS**

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110

*Counsel for Plaintiff Assured Guaranty*
*Municipal Corp.*

October 4, 2013

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ...................................................................................................... 6

I. The Release is a Narrow, Inapplicable Red Herring
That is Not Even Properly Before this Court ........................................ 6

A. The Release Is Not Properly Before the Court ........................... 6

B. Assured's Claims Are Not Covered by the Release .................... 7

II. Applicable Pleading Standard ............................................................. 9

III. Assured Has Stated a Claim for Common Law Fraud ....................... 11

A. The Defendants Made Material Misrepresentations to Assured .............. 11

B. The Defendants' Failure to Disclose Material Information to
Assured Is Separately Actionable ............................................. 17

C. Viewing RBS's Knowledge Collectively, Assured Has Sufficiently
Alleged Scienter ....................................................................... 18

1. The Defendants' Knowledge of the Falsity of Their
Representations and Conscious Misbehavior or Recklessness ........... 20

a. The Pervasive, Verified Level of Defects In the
Mortgage Loans Securitized by RBS ........................... 20

b. The Defendants Stuffed Their RMBS Deals With Mortgage
Loans They Knew Were Defective ................................ 21

c. Assured's Other Confidential Witnesses Further Attest to RBS's
Pre-Policy Knowledge of Defective Loans in Soundview ........... 22

d. Governmental Investigations and Settlements with RBS ............. 23

e. The Defendants' Long-Standing Relationship with WMC and
Knowledge of its Underwriting Practices ..................... 24

f. Astronomical Default Rates in Soundview ................... 25

i

2.   The Amended Complaint Also Sufficiently Alleges RBS's
Motive and Opportunity to Defraud Assured ..................................... 26

D.   Assured Properly Pled Reliance on the RBS Materials ........................... 27

1.   Assured's Actual Reliance .................................................. 27

2.   Assured's Reasonable Reliance ........................................... 28

IV.   Assured Has Adequately Pled A Violation of New York Insurance Law
§ 3105 .......................................................................................................... 34

V.   RBS Fails Almost Entirely Even to Address Assured's
Aiding and Abetting Claim ................................................................... 37

CONCLUSION ...................................................................................................... 38

## **TABLE OF AUTHORITIES**

**Cases**                                                                          **Page(s)**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
    544 F. Supp. 2d 199 (S.D.N.Y. 2008) ............................................................ 23

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
    888 F. Supp. 2d 431 (S.D.N.Y. 2012) ....................................................... 15, 16

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) ............................................................ 10

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) .................................. 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007) .................................. 9

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ............................................................................. 6

*Chase Manhattan Bank v. New Hampshire Ins. Co.*,
    759 N.Y.S.2d 17 (1st Dep't 2003) .................................................................. 28

*CIFG Assurance North Am., Inc. v. Goldman, Sachs & Co.*,
    106 A.D.3d 437 (1st Dep't 2013) .............................................................. 29, 30

*CIFG Assurance North Am., Inc. v. Goldman, Sachs & Co.*,
    Index No. 652286/2011, 2012 Misc. LEXIS 3986 (N.Y. Co. May 1, 2012) .................. 30

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) ................................................................................. 9

*Curanovic v. New York Cent. Mut. Fire Ins. Co.*,
    307 A.D.2d 435, 762 N.Y.S.2d 148 (3d Dep't 2003) ...................................... 36

*Devaney v. Chester*,
    709 F. Supp. 1255 (S.D.N.Y. 1989) ............................................................... 27

*Dexia SA/NV v. Deutsche Bank AG*,
    11 Civ. 5672 (JSR). 2013 WL 98063 (S.D.N.Y. Jan. 4, 2013) ........................ 15

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) ........................................................................ 21

*Eisert v. Town of Hempstead*,
    918 F. Supp. 601 (E.D.N.Y. 1996) ............................................................................. 12

*Employees' Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co., Inc.*,
    814 F. Supp. 2d 344 (S.D.N.Y. 2011) ........................................................................ 15

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
    46 A.D.3d 400 (1st Dep't 2007) ................................................................................. 14

*Fed. Hous. Fin. Agency v. Goldman, Sachs & Co.*,
    No. 11-cv-6198 (DLC), 2012 WL 5494923 (S.D.N.Y. Nov. 12, 2012) ..................... 17

*First National Bank of Hempstead, N.Y. v. Level Club, Inc.*,
    241 A.D. 433, 272 N.Y.S. 273 (1st Dep't 1934) ....................................................... 14

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    2010 WL 3790810 ...................................................................................................... 24

*Glidepath Holding v. Spherion Corp.*,
    590 F. Supp. 2d 435 (S.D.N.Y. 2007) ....................................................................... 26

*Gotham Boxing Inc. v. Finkel*,
    No. 601479–2007, 2008 WL 104155 (N.Y. Sup. Ct. Jan. 8, 2008) ........................... 37

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
    748 F.2d 729 (2d Cir. 1984) ....................................................................................... 29

*GuideOne Specialty Mut. Ins. Co. v. Congregation Adas Yereim*,
    593 F. Supp. 2d 471 (E.D.N.Y. 2009) ................................................................. 34, 37

*HSH Nordbank AG v. UBS AG*,
    941 N.Y.S.2d 59 (1st Dep't 2012) .............................................................................. 28

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
    159 F.3d 723 (2d Cir.1998) ........................................................................................ 33

*In re Bear Stearns Mortgage Pass-Through Certificates Litig.*,
    851 F. Supp 2d 746 (S.D.N.Y. 2012) ............................................................... 33

*In re Bristol Myers Squibb Co. Secs. Litig.*,
    586 F.Supp.2d 148 (S.D.N.Y.2008) ................................................................. 24

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) .............................................................. 26

*In re Gentiva Sec. Litig.*,
    10-cv-5064, 2013 WL 1200334 (E.D.N.Y. Mar. 25, 2013) ............................. 24

*In re Longtop Fin. Technologies Ltd. Sec. Litig.*,
    910 F. Supp. 2d 561 (S.D.N.Y. 2012) .............................................................. 18

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    218 F.R.D. 76 (S.D.N.Y. 2003) ....................................................................... 24

*In re Navarre Corp. Sec. Litig.*,
    299 F.3d 735 (8th Cir. 2002) ........................................................................... 13

*In re Time Warner Sec. Litig.*,
    9 F.3d 259 (2d Cir.1993) ................................................................................. 26

*In re U.S.A. Classic Securities Litigation*,
    93 Civ. 6667 (JSM), 1995 WL 363841 (S.D.N.Y. June 19, 1995) .................. 13

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) .............................................................. 10

*Intellivision v. Microsoft Corp.*,
    07 Civ. 4079 (JGK), 2008 U.S. Dist. LEXIS 63564 (S.D.N.Y. Aug. 20, 2008) ................. 9

*Janus Capital Group, Inc. v. First Derivative* Traders,
    131 S.Ct. 2296, 180 L.Ed.2d 166 (2011) ........................................................ 16

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
    478 Fed. Appx. 679 (2d Cir. 2012) .................................................................. 19

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
    821 F. Supp. 2d 616 (S.D.N.Y. 2012) .............................................................. 21

*Leamy v. Berkshire Life Ins. Co.*,
    39 N.Y.2d 271, 347 N.E.2d 889 (1976) ........................................................ 36

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ................................................................... 11, 17

*Levine v. AtriCure, Inc.*,
    594 F. Supp. 2d 471 (S.D.N.Y. 2009) ............................................................. 6

*Lukowsky v. Shalit*,
    110 A.D.2d 563, 487 N.Y.S.2d 781 (1985) .................................................. 12

*M & T Bank Corp. v. Gemstone CDO VII, Ltd.*,
    23 Misc. 3d 1105(A), 881 N.Y.S.2d 364 (Sup. Ct. 2009).............................. 33

*Maloul v. Berkowitz*,
    No. 07-cv-8525, 2008 WL 2876532 (S.D.N.Y. July 23, 2008) ....................... 28

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    105 A.D.3d 412, 963 N.Y.S.2d 21 (2013) ................................................ 34, 37

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    39 Misc. 3d 1220(A) (N.Y. Sup. Ct. 2013) ................................................... 33

*MBIA Ins.Corp. v. Merrill Lynch*,
    916 N.Y.S.2d 54 (1st Dep't 2011) ................................................................ 28

*MBIA v. Morgan Stanley*,
    No. 29961/10, 2011 WL 2118336 (Westchester Cty. June 24, 2011) ............. 20

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007) ......................................................................... 9

*Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*,
    747 F. Supp. 2d 406 (S.D.N.Y. 2010) ............................................................ 9

*Muller–Paisner v. TIAA,*
    289 Fed. Appx. 461 (2d Cir. 2008) ................................................................ 11

*N. Atl. Life Ins. Co. of Am. v. Katz,*
    163 A.D.2d 283, 557 N.Y.S.2d 150 (2d Dep't 1990) ...................................... 18

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ...................................................................... 13, 19

*Precision Auto Accessories, Inc. v. Utica First Ins. Co.,*
    52 A.D.3d 1198, 859 N.Y.S.2d 799 (4th Dep't 2008) .................................... 36

*Prickett v. New York Life Ins. Co.,*
    2012 WL 4053810 (S.D.N.Y. 2012) ......................................................... 19, 26

*Rafi v. Rutgers Cas. Ins. Co.,*
    59 A.D.3d 1057, 872 N.Y.S.2d 799 (4th Dep't 2009) .................................... 36

*Republic Bank & Trust Co. v. Bear Stearns & Co.,*
    683 F.3d 239 (6th Cir. 2012) ......................................................................... 25

*Robinson v. Deutsche Bank Trust Co. Americas,*
    572 F. Supp. 2d 319 (S.D.N.Y. 2008) ............................................................ 28

*RSM Prod. Corp. v. Friedman,*
    643 F. Supp. 2d 382 (S.D.N.Y. 2009) ............................................................ 24

*S.E.C . v. Dunn,*
    587 F. Supp. 2d 486 (S.D.N.Y. 2008) ............................................................ 10

*S.E.C. v. Lee,*
    720 F. Supp. 2d 305 (S.D.N.Y. 2010) ............................................................ 10

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,*
    365 F.3d 353 (5th Cir. 2004) ......................................................................... 13

*Steinhardt Group Inc. v. Citicorp,*
    272 A.D.2d 255, 708 N.Y.S.2d 91 (1st Dep't 2000) ...................................... 28

*Striker v. Graham Pest Control Co. Inc.*,
 179 A.D.2d 984, 578 N.Y.S.2d 719 (3d Dep't 1992) ....................................... 17

*Superior Technical Resources, Inc. v. Lawson Software, Inc.*,
 851 N.Y.S.2d 74, 2007 WL 4291575 (Sup. Ct. Erie Co. Dec. 7, 2007) ...................... 8, 28

*Swersky v. Dreyer & Traub*,
 219 A.D.2d 321, 643 N.Y.S.2d 33 (1st Dep't 1996)........................................ 28

*Syncora Guar. Inc. v. EMC Mortg. Corp.*,
 874 F. Supp. 2d 328 (S.D.N.Y. 2012) ................................................... 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308, 320, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ................................. 10, 19

*Union Central Life Ins. Co. v. Credit Suisse Securities (USA), LLC*,
 11 Civ. 2327 (GBD), 2013 WL 1342529 (S.D.N.Y. Mar. 29, 2013)............. 10, 15, 19, 23

*UST Private Equity Inv. Fund, Inc. v. Salomon Smith Barney*,
 733 N.Y.S.2d 385 (1st Dept. 2001) ...................................................... 29

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers*, LLP,
 348 F. Supp. 2d 255 (S.D.N.Y. 2004) ................................................... 37

*Woori Bank v. RBS Secs. Inc.*,
 910 F. Supp. 2d 697 (S.D.N.Y. 2012)................................................... 25

## Other Authorities

15 U.S.C. § 78j(b) ...................................................................... 10

15 U.S.C. § 78-u(4)(a)(1) ............................................................... 10

15 U.S.C. § 78u-4(b)(2) ................................................................. 10

17 C.F.R. § 240.10b-5 .................................................................. 10

Black's Law Dictionary (9th ed. 2009) ................................................... 35

CPLR § 3106............................................................................ 37

Fed. R. Civ. P. 12(b)(6) ................................................................. 9

Fed. R. Civ. P. 8(c)(1) ........................................................................................... 6

Fed. R. Civ. P. 9(b)..................................................................................... 5, 9, 10

N.Y. Ins. L. § 6908 ............................................................................................. 34

N.Y. Ins. Law § 3105 .......................................................................... 4, 5, 11, 34, 35

RESTATEMENT (SECOND) OF TORTS, § 525 ................................................................ 14

60A N.Y. Jur. 2d Fraud and Deceit §§ 20, 30, 57 ................................................. 13, 14

Plaintiff Assured Guaranty Municipal Corp. ("Assured") respectfully submits this memorandum of law in opposition to the motion of Defendants RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.) ("RBS Securities"), RBS Financial Products Inc. (f/k/a Greenwich Capital Financial Products, Inc.) ("RBS Financial Products"), and Financial Asset Securities Corp. ("FAS," and together with RBS Securities and RBS Financial Products, "RBS" or "Defendants") to dismiss the Amended Complaint ("Compl.").

## PRELIMINARY STATEMENT

Wrapping itself in inapplicable federal securities law pleading standards relating to investors suing under Section 10(b) of the Securities Exchange Act, RBS would have this Court forget entirely that Assured has asserted claims for common law fraud *under state law* and for violation of New York Insurance Law § 3105 based upon a commercial transaction for the purchase of insurance, namely, RBS's application in 2007 for a financial guaranty insurance policy (the "Policy") from Assured.  At that time, RBS was in the process of soliciting buyers for mortgage-backed pass-through certificates that would be issued of another of RBS's many lucrative residential mortgage-backed securities ("RMBS") securitizations, a $1.15 billion securitization named Soundview Home Loan Trust 2007-WMC1 ("Soundview").  The certificates would represent a participation in the principal and interest payments made by the mortgage borrowers in respect of certain of the underlying mortgage loans that had been purchased by RBS from the originator, WMC Mortgage Corp. ("WMC"), and selected for inclusion in Soundview.

With only two to three weeks remaining before Soundview was scheduled to close, RBS Securities, as underwriter, still was securing purchasers for the Soundview certificates.  A problem RBS faced was that an investor considering purchasing an entire tranche of certificates having an original principal balance of more than $291 million (the "Certificates") would not commit to the

purchase unless a financial guarantor first agreed to insure the Certificates.  Without such an insurance policy, the investor would walk away and RBS would be stuck with $291 million of RMBS on its own books.  Compl. ¶ 99.

So with the game clock winding down, RBS approached Assured in need of an insurance policy.  *Id.* ¶ 2.  For the specific purpose of inducing Assured to accept the risk of insuring the Certificates, RBS presented to Assured certain written materials authored and prepared by them, which unbeknownst to Assured contained false data.  *First*, RBS gave Assured an "RBS" labeled spreadsheet containing data about each underlying mortgage loan, which identifies RBS employees as having authored and/or modified the document prior to its presentment to Assured (the "Loan Tape").  *Id.* ¶¶ 45, 46, 49.  *Second*, RBS gave Assured a term sheet describing the structure of the Soundview transaction and pool-level data about the underlying loans (the "Term Sheet").  The Term Sheet also bears RBS's name and does not attribute the loan data contained therein to WMC or any other source.  *Id.* ¶ 50.  *Third*, RBS gave Assured a Prospectus Supplement for the Soundview transaction (the "Prospectus Supplement," and together with the Loan Tape and Term Sheet, the "RBS Materials").  The Prospectus Supplement (bearing the name of all three Defendants on the cover) contains specific statements about underwriting measures taken by WMC to ensure the creditworthiness of the underlying mortgage borrowers, as well as statements about low debt-to-income ratios ("DTIs") for the underlying loans.

In reliance upon the RBS Materials and other information it analyzed, Assured issued the Policy.  *Id.* ¶¶ 43, 56-68.  Since then, however, the mortgage loans collateralizing the insured Certificates (the "Mortgage Loans") have experienced extraordinarily high rates of default, the mortgaged properties have proven entirely inadequate to secure the unpaid Mortgage Loan

principal, and the insured Certificates' underlying credit rating has collapsed to "junk" status. Assured projects paying total unreimbursed claims in excess of $100 million. *Id*. ¶¶ 14, 108.

Upon obtaining authorization in 2010 to access the individual Mortgage Loan files, Assured commissioned a loan-by-loan review of nearly all the Mortgage Loans. Although undisclosed to Assured in 2007, the loan-level review revealed that RBS had provided Assured with false data and that WMC had engaged in shockingly defective and fraudulent loan origination practices with respect to the Mortgage Loans. *Id*. ¶ 11. Of the 1,580 (out of 1,593) Mortgage Loans that Assured audited, more than 1,444 loans – ***91%*** – exhibited significant variances from the loan data set forth in the RBS Materials as well as breaches of underwriting guidelines.

Although RBS had worked closely with WMC to assemble RMBS securitizations and knew WMC's internal loan underwriting practices well, RBS never disclosed to Assured that WMC loans contained inferior credit qualities (*e.g.*, high DTIs) and were originated as a result of systematically abandoned underwriting guidelines. *Id*. ¶¶ 6, 61, 84, 85. Former employees of RBS and its consultants have recently confirmed to Assured that RBS knew but did not disclose the substantial credit risk involved in the Soundview transaction. For example, one RBS employee who worked on Soundview securitizations has revealed that RBS strictly forbid its employees from even speaking about the quality of mortgage loans being securitized, and RBS consultants assessing loan quality for RBS securitizations were docked bonuses and removed from RBS engagements because, in RBS's view, they had recommended too many defective loans be removed from the RBS transactions. *Id*. ¶¶ 95-103. None of this was disclosed to Assured when RBS sought the Policy.

By presenting the RBS Materials to Assured for the purpose of describing the quality and nature of the Mortgage Loans underlying the Certificates and the underwriting practices relating thereto, which descriptions RBS knew were false, RBS made material misrepresentations to

Assured that were designed to, and did, induce Assured to issue the Policy. Given the mountain of liability under the Policy that Assured now faces, Assured has sued the RBS Defendants for common law fraud, aiding and abetting common law fraud and violation of New York Insurance Law § 3105, which provides remedies to insurance companies (including financial guarantors) who issue an insurance policy as the result of material misrepresentations by the applicant.

Despite the fact that the RBS Defendants were the sole persons who solicited Assured to issue the Policy and who, by tendering the RBS Materials to Assured, made all of the subject misrepresentations and omissions, RBS contends it is insulated from any responsibility whatsoever by pointing the finger at everyone else, including Assured, and improperly asserting purported facts not alleged in the Amended Complaint as grounds for prevailing at the pleading stage on the merits.

*First*, RBS seeks dismissal of Assured's claims based upon a release between RBS and Assured that not only is improper to consider on a motion to dismiss, but also is narrow and inapplicable to Assured's claims. In so doing, RBS also raises a host of disputed factual issues that cannot be resolved as a matter of law on a motion to dismiss.

*Second*, RBS challenges Assured's common law fraud claims on various grounds, none of which provides a basis for dismissal. RBS first argues that Assured has not alleged any "affirmative" misrepresentation made by RBS, contending that RBS merely "passed along" documents and their contents to Assured for which WMC was the source. The argument ignores, however, the specific allegations in the Amended Complaint which aver that RBS's name and fingerprints are all over the RBS Materials as the author, contributor and/or sponsor. RBS also ignores the principle that a representation can be based upon conduct as well as words, bringing RBS's physical tender of the RBS Materials to Assured for the sole purpose of procuring the Policy well within the ambit of common law fraud. RBS similarly fails to recognize that, in the context of

4

this transaction and the representations that RBS did make, RBS had a duty to disclose to Assured, but did not, the inaccuracies in the Mortgage Loan data and its knowledge of WMC's abandonment of its underwriting guidelines.

RBS also contends that Assured failed to plead sufficiently that RBS acted with scienter, relying *exclusively* (and improperly) upon the federal statutory pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Notwithstanding that Assured's allegations of RBS's knowledge meet the PSLRA's heightened pleading standard, particularly when the allegations are viewed as a whole (as is required) rather than as isolated parts, that statutorily created standard does *not* apply to common law fraud claims (under state law), which have long been governed by Federal Rule of Civil Procedure 9(b) permitting scienter to be pled "generally." Because Assured's fraud claim is sufficiently pled, therefore, Assured's alternative claim for aiding and abetting survives as well.

Finally, RBS contends Assured's claim for violation of New York Insurance Law § 3105 should be dismissed because the only remedy § 3105 affords is rescission or rescissory damages. What RBS ignores, however, is that the plain text of § 3105 provides Assured a remedy in money damages.  RBS also ignores entirely that a violation of § 3105 does *not* require scienter.  Therefore, irrespective of this Court's finding on scienter regarding Assured's common law fraud claim, RBS's material misrepresentations made in seeking the Policy entitle Assured to sue RBS under § 3105 to recover its actual and projected claim payments, as New York's First Department recently has held.

# ARGUMENT[1]

## I.   The Release is a Narrow, Inapplicable Red Herring That is Not Even Properly Before this Court

RBS devotes substantial energy to accusing Assured of ignoring a confidentiality agreement and release (the "Release") that purportedly bars Assured's claims.  *See* Hail Decl. Exh. D. Although that argument is a meritless side-show not even permitted on this motion, it also raises fact issues that cannot be resolved on a motion to dismiss.[2]

### A.   The Release Is Not Properly Before the Court

Under binding Second Circuit precedent, consideration of the Release at this stage is not permitted.  "[P]laintiff's *reliance* on the terms and effect of a document *in drafting the complaint* is a necessary prerequisite to the court's consideration of the document on a dismissal motion; *mere notice or possession is not enough*."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis added).  Assured has not, however, relied upon the Release (or its subject matter) in preparing the Amended Complaint, and there is no indication it has.  RBS erroneously contends that the loan due diligence reports by "Clayton Group" referenced in the Release are the same loan due diligence reports that Assured alleges gave rise to RBS's scienter (RBS Br. at 8), but that is not what the Amended Complaint says.  *See* Compl. ¶¶ 87-92.  RBS further argues Assured is aware of the Release but has intentionally disregarded it.  RBS Br. at 9.  As *Chambers* held, however, Assured's "mere notice or possession [of the Release] is not enough" to permit RBS to raise at the pleading stage the extrinsic document (or the fact issues raised by its interpretation).

---

[1] The facts supporting Assured's opposition to RBS's motion are fully set forth in the Amended Complaint, and are referenced below to the extent necessary to address RBS's arguments.

[2] As a strict pleading matter, Assured had no obligation to raise the Release in the Amended Complaint.  The Release's proper procedural posture, if any, is as an affirmative defense to be raised by RBS in its Answer.  *See* Fed. R. Civ. P. 8(c)(1).  Therefore, Assured is not required to preemptively plead facts to overcome any such affirmative defense.  *See Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471, 476 (S.D.N.Y. 2009).  So even if the Release were applicable to Assured's claims (and as explained herein, it is not), Assured has no obligation to reference the Release in the Amended Complaint, and not doing so is a matter of right that did not "conceal" anything from the Court.

### B.      Assured's Claims Are Not Covered by the Release

Notwithstanding that the Release should not be considered on this motion to dismiss, the factual record submitted by RBS fails to demonstrate as a matter of law that Assured's claims are within the narrow scope of claims released by the Release; indeed, the opposite is apparent.

After RBS gave Assured the Loan Tape on March 1, 2007 and again on March 7, 2007 (Compl. ¶¶ 45-48) and after RBS gave Assured the Term Sheet on March 7, 2007 (*id*. ¶ 49), Assured on March 8, 2007 asked RBS for "any due diligence done on the loans."  Hail Decl. Exh. A at 4.  Therefore, RBS *had made* its misrepresentations in connection with the Loan Tape and Term Sheet (on which Assured bases its claims) *before* Assured even asked for RBS's due diligence reports.  On March 9, 2007, RBS responded, "Please sign the attached *due diligence release* form and I will send over the due diligence results."  *Id*. (emphasis added).  Prior to such time, RBS had not requested any release in order for Assured to obtain the Loan Tape and Term Sheet.

The Release states, in relevant part:

Financial Security Assurance Inc. [Assured] ("Recipient") has requested that Greenwich Capital Markets, Inc. [RBS Securities] . . . *provide* it with *certain information and analysis concerning [Soundview] (the "Transaction"), including without limitation, a report prepared by the Clayton Group concerning its review of certain of the assets proposed to be included in the Transaction (collectively, the "Information").*

*       *       *

Recipient . . . hereby acknowledges and agrees that

(a)  *the Information has been prepared by third parties . . . the accuracy and completeness of which has not been independently verified by [RBS]* and for which it is not responsible;

(b)  *the Information was prepared solely for [RBS]'s purposes*, is not all-inclusive and does not contain all of the information that the Recipient may require to take a complete analysis of the Transaction; [and]

7

(c) Recipient will make its own independent assessment of the merits and risks of
the Transaction;

\*   \*   \*

In consideration of [RBS] providing the Information to Recipient, Recipient . . .
hereby unconditionally and irrevocably (a) releases [RBS] from any and all actions,
claims, liabilities, damages, costs and expenses which in any way *relate to or arise
out of [RBS]'s disclosure of such Information to Recipient . . . .*

Later that same day, Assured returned the signed Release to RBS.  *Id*. at p. 2-3.  On March 12,

2007, RBS emailed the third-party diligence review to Assured.  *Id*. at p. 2.  Under the terms of the

Release, therefore, any document RBS provided to Assured on or after March 9, 2007 that was (a)

prepared by RBS or (b) prepared (by anyone) for use by persons other than just RBS is *not*

"Information" and is outside the scope of the Release.

Accordingly, since RBS had provided Assured with the Loan Tape and Term Sheet prior to

March 9, 2007 (without any request for a release) and because those materials were prepared by

RBS, neither is "Information" under the Release.  And although RBS sent Assured the Prospectus

Supplement after March 9, 2007, because that document was prepared by RBS and, as an offering

document, was intended for use by potential investors rather than solely for RBS's purposes, the

Prospectus Supplement also is not "Information" under the Release.  It follows, therefore, that

Assured's claims against RBS arising from RBS's presentment to Assured of the RBS Materials are

not claims arising from or relating to RBS's disclosure of "Information" and are not covered by the

Release.  More importantly for present purposes, however, resolution of the parties' competing

interpretations of the Release and its subject matter is not proper on this motion.  As the Court held

in *Info. Superhighway, Inc. v. Talk Am., Inc.*, 274 F. Supp. 2d 466, 470 (S.D.N.Y. 2003):

> Under New York law, a release – like any contract – must be construed in accordance
> with the intent of the parties who executed it.  A release will not be given effect
> unless it contains an explicit, unequivocal statement of a present promise to release [a
> party] from liability.  Moreover, because the law looks with disfavor upon agreements

8

> intended to absolve [a party] from the consequences of his [wrongdoing], *a release which purports to excuse a party from responsibility for misconduct is subject to the closest of judicial scrutiny. Under this standard of scrutiny, therefore, an ambiguous release may not form the basis for a motion to dismiss*.

*Id*. at 470 (citations and quotation marks omitted) (emphasis added).

## II.    Applicable Pleading Standard

When addressing a motion under Federal Rule of Civil Procedure 12(b)(6), the Court will "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted). If the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face," the Court should not dismiss the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

"To state a claim for common law fraud in New York, a plaintiff must show [i] a material representation or omission of fact, [ii] made with knowledge of its falsity, with scienter or an intent to defraud, [iii] upon which the plaintiff reasonably relied, and [iv] that such reliance caused damage to the plaintiff." *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 413-14 (S.D.N.Y. 2010). Under Federal Rule of Civil Procedure 9(b), a plaintiff must also "adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Intellivision v. Microsoft Corp.*, 07 Civ. 4079 (JGK), 2008 U.S. Dist. LEXIS 63564, *8-9 (S.D.N.Y. Aug. 20, 2008) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)). On the other hand (and contrary to RBS's

9

repeated misstatement of the law[3]), "[m]alice, intent, knowledge, and other conditions of a person's state of mind may be alleged *generally*."  Fed. R. Civ. P. 9(b) (emphasis added).

Notwithstanding that Assured has alleged common law fraud, RBS contends that Assured's fraud claim must also satisfy the PSLRA's heightened pleading standard for federal securities fraud claims brought pursuant to Securities Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  However, by its own terms, the PSLRA does not apply to common law fraud claims.  15 U.S.C. § 78-u(4)(a)(1) ("The provisions of this subsection shall apply in each private action arising *under this chapter*.") (emphasis added).[4]  Courts in this judicial district agree.  *See*, *e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 380 (S.D.N.Y. 2011); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 414 (S.D.N.Y. 2010); *S.E.C. v. Lee*,

---

[3] Throughout its brief, RBS erroneously asserts that the particularity standard under Rule 9(b) encompasses allegations of scienter, despite the rule's express carve-out making clear it does not.  *See*, *e.g.*, RBS Br. at 16 ("Assured's remaining scienter allegations, *id*. ¶¶ 83-107, also fail to satisfy Rule 9(b)").  RBS even goes so far as to incompletely quote a case in order to suggest that a court has held that the Rule 9(b) particularity standard applies to allegations of scienter for a common law fraud claim.  At page 15 of its brief, RBS quotes *Union Central Life Ins. Co. v. Credit Suisse Securities (USA), LLC*, 11 Civ. 2327 (GBD), 2013 WL 1342529 (S.D.N.Y. Mar. 29, 2013) as having held that certain fraud allegations in that action "were insufficient to 'demonstrate scienter as required by 9(b).'"  In fact, however, the *Union Central* Court was addressing the adequacy of the plaintiff's allegations of securities fraud under Rule 10b-5 in accordance with the *PSLRA's* statutory scienter requirement.  In that context, the Court held that the allegations were insufficient to "demonstrate scienter as required by 9(b) *and the PSLRA*."  *Id*. at *25 (emphasis added).  As discussed below, the scienter requirements for federal securities fraud claims under the PSLRA are more exacting and expressly require "particularity" demonstrating a "strong inference" of scienter.  *See* 15 U.S.C. § 78u-4(b)(2).  Common law fraud claims, however, do not, and RBS's partial recitation of the quote is misleading.

[4] Proceeding from the flawed premise that Assured must allege RBS's state of mind with "particularized" allegations giving rise to a "strong inference" of scienter, as required by the PSLRA, RBS further argues that Assured's allegations must meet the test articulated in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320, 127 S. Ct. 2499, 2508, 168 L. Ed. 2d 179, 191 (2007) for what warrants a strong inference of scienter under the PSLRA.  RBS Br. at 13.  However, since the PSLRA does not apply to common law fraud claims, the *Tellabs* standard cannot apply.  Moreover, the Second Circuit has not ruled that *Tellabs* applies to non-PSLRA claims governed by Rule 9(b), and courts in this district have declined to so extend the *Tellabs* standard.  *See*, *e.g.*, *S.E.C . v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) (declining to apply *Tellabs* standard to non-PSLRA claims under Rule 9(b)).  Assuming *arguendo*, however, that the *Tellabs* standard applies here, for the reasons discussed herein, Assured's allegations create an equally compelling inference that RBS knew of the misrepresentations of risks being made to Assured that RBS did not disclose.

720 F. Supp. 2d 305, 327 (S.D.N.Y. 2010) (citing *Muller–Paisner v. TIAA,* 289 Fed. Appx. 461, 463 (2d Cir. 2008).[5]

## III.   Assured Has Stated a Claim for Common Law Fraud

### A.   The Defendants Made Material Misrepresentations to Assured

In addition to alleging the elements of fraud, Rule 9(b) requires the plaintiff to "state with particularity the circumstances constituting fraud."  That is, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  Assured's Amended Complaint very specifically meets this standard, setting forth the representations RBS made to Assured regarding the nature and quality of the Mortgage Loans in the Soundview transaction and – by reference to individual loan numbers – how RBS's representations were rampantly false and misleading. Compl. ¶¶ 44-55 & Exh. A.

For example, Assured alleges precisely the information that was provided to Assured (the "RBS Greenwich Securities" branded Loan Tape and Term Sheet), the information in the Loan Tape and Term Sheet that was false and misleading (*e.g.*, DTI ratios), who provided the false and misleading information to Assured (Greg McSweeney and Ara Balabanian, on behalf of RBS Securities, RBS Financial Products and FAS), to whom, where and when the information was provided to Assured (to David Williams by email (twice) on March 1, 2007 and March 7, 2007), and why the statements are fraudulent (*e.g.*, the documents stated that there were no Mortgage Loans with DTI ratios greater than 60%, and Assured relied upon such information in issuing the

---

[5] While a number of courts rotely apply the PSLRA's "strong inference" standard to common law claims without analysis, Assured can find no case in which the Second Circuit explicitly has held that such statutory standard applies to claims based solely upon New York common law fraud, or Section 3105 of the New York Insurance Law, where no federal securities law claims have been alleged.

Policy, when in fact there were substantial numbers of Mortgage Loans with DTIs well above that threshold, constituting far greater risk in the transaction than the Loan Tape and Term Sheet indicate).  Compl. ¶¶ 45-50, 78-82.  Assured has made equally detailed "who, what, when, where and how" allegations regarding RBS's presentment to Assured of the Prospectus Supplement and its false and misleading statements regarding WMC's underwriting standards and DTI ratios that also induced Assured to issue the Policy.  *Id.* ¶¶ 55, 74-77, 81-82.

In its motion, RBS does not challenge the particularity of Assured's allegations regarding which statements in the RBS Materials constitute the representations at issue or who presented the RBS Materials containing such statements to whom at Assured, and when.  To that extent, RBS has conceded that Assured's common law fraud allegations satisfy Rule 9(b).

Instead, the Defendants attempt to dodge responsibility for having presented the RBS Materials to Assured in order to procure the Policy that *RBS itself* needed, arguing that the "maker" of such representations was WMC and that RBS was merely an innocent middle-man "passing along" the statements of others – without any accountability whatsoever.  As such, RBS contends, RBS made no "affirmative" representations to Assured.  RBS's view of what constitutes an actionable misrepresentation for fraud is unduly narrow and ignores not only New York common law, but also common sense.

By tendering to Assured critically important documents containing statements about the Mortgage Loans and their underwriting, which statements RBS knew to be false (*see* Point III.C. *infra*), RBS made actionable misrepresentations under New York law.  "[A] misrepresentation may be the product of the intentional suppression of the truth, . . . and may be effected by words, conduct or the *exhibition of documents*."  *Eisert v. Town of Hempstead*, 918 F. Supp. 601, 615 (E.D.N.Y. 1996) (emphasis added); *see also Lukowsky v. Shalit*, 110 A.D.2d 563, 568, 487 N.Y.S.2d 781, 785

(1985) ("It is equally true that a misrepresentation . . . may be effected by words, conduct or the *exhibition of documents*") (citing 24 N.Y.Jur., Fraud and Deceit, §§ 16, 33 [now 60A N.Y. Jur. 2d Fraud and Deceit §§ 20, 30, 57]) (emphasis added).  Therefore, RBS's myopic focus on whether RBS's employees uttered "affirmative statements" (RBS Br. at 10) misses the forest for the trees.

 To be sure, the Amended Complaint does allege representations "made by" RBS itself.  Each of the RBS Materials clearly states – on its face – that it contains information authored, or at least sponsored by, "RBS."  For example, the Loan Tape bears a large logo for "RBS Greenwich Capital," the name under which RBS Securities did business, without any attribution of its contents to WMC or anyone else.  And the metadata of the file shows it came from a "Greenwich Capital Markets" computer, the former legal name of RBS Securities, and was authored and/or last modified by Charles Shuey III, an employee of one or more of the Defendants.  Compl. ¶¶ 45-46.  The Term Sheet, in addition to being provided to Assured by RBS's agents, bears the logos of RBS Securities and FAS and also has no attribution of its contents to WMC or anyone else.  *Id*. ¶ 50.  The face of the Prospectus Supplement bears the names of each of RBS Securities, RBS Financial Products and FAS and describes each element of the Soundview transaction that they worked together to create.  *Id.* ¶ 55.  Those, among other facts, make clear that RBS bears liability for the misrepresentations in presenting those documents to Assured to procure the Policy.  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *In re U.S.A. Classic Securities Litigation*, 93 Civ. 6667 (JSM), 1995 WL 363841 at *5 (S.D.N.Y. June 19, 1995); *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 373 (5th Cir. 2004); *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002).

 Furthermore, it also may be reasonably implied or inferred from RBS's conduct in providing the "RBS" branded materials to Assured solely to procure the Policy that RBS was representing to

Assured that the RBS Materials contained loan and underwriting information upon which Assured

should and could rely in deciding whether to issue the Policy.   "[A] misrepresentation *need not be*

*express* but may be implied or inferred from circumstances that are in fact *equivalent to a positive*

*representation*, . . . ."  60A N.Y. Jur. 2d Fraud and Deceit § 30 (emphasis added); *see also*

Restatement (Second) of Torts, § 525, cmt. B ("'Misrepresentation' is used in this Restatement

to denote not only words spoken or written but also any other conduct that amounts to an assertion

not in accordance with the truth.  *Thus, words or conduct asserting the existence of a fact constitute*

*a misrepresentation if the fact does not exist*") (emphasis added).  As New York's First Department

held in *First National Bank of Hempstead, N.Y. v. Level Club, Inc.*, 241 A.D. 433, 439, 272 N.Y.S.

273, 279-80 (1st Dep't 1934), "[T]he language of the prospectus is to be interpreted by the effect

which it would produce upon an ordinary mind;' where '[t]he general impression created by the

prospectus . . .  was that the notes were a safe and sound investment,' and such general impression

was deceptive, defendants could be held liable for fraud.'"  Therefore, assessed by the proper (and

common sense) measure of what constitutes an actionable misrepresentation, Assured's Amended

Complaint alleges facts from which it reasonably may be inferred RBS intended its conduct to

constitute a representation of fact to Assured about the nature and quality of the underlying

Mortgage Loans, and that Assured reasonably understood RBS's conduct the same way.

The cases cited by RBS in support of its no-affirmative-statement argument (RBS Br. at 10-

11) do not come close to countering the law of misrepresentation described above.  In *Eurycleia*

*Partners, LP v. Seward & Kissel, LLP*, 46 A.D.3d 400 (1st  Dep't 2007), the defendants were third-

party service providers (lawyers and accountants) to the RMBS sponsor and underwriter who (i)

allegedly knew of the misrepresentations in the offering memorandum but failed to correct them,

(ii) did not have any direct dealings with the plaintiff and (iii) did not take any action with an intent

to defraud.  Thus, there was no actionable misrepresentation by them.  *Id.* at 401-02.  The service

providers in *Eurycleia* bear no resemblance to RBS here.  *Dexia SA/NV v. Deutsche Bank AG*, 11

Civ. 5672 (JSR), 2013 WL 98063 (S.D.N.Y. Jan. 4, 2013) has even less to do with RBS's argument,

since the *Dexia* Court held that generalized references to a host of offering documents without

allegations of specific statements therein failed the particularity requirement of Rule 9(b).  2013 WL

98063, at *6.[6]

The cases that RBS cites to support its further argument that RBS was merely a messenger

passing along *WMC's* representations fare no better.  In *Union Central Life Ins. Co. v. Credit Suisse*

*Securities (USA), LLC*, No. 11-cv-2327, 2013 WL 1342529, at *8-10 (S.D.N.Y. Mar. 29, 2013), the

Court took issue with the plaintiff's failure to plead *scienter* and did not actually rule on whether

defendants made misrepresentations by providing information sourced to others.  *Id.* at *8.  In fact,

by its holding, the Court suggested that a fraud claim would lie in such circumstance if the plaintiff

had alleged a factual basis for the defendant having knowledge that the underlying information was

false.  *Id.*  With respect to *Employees' Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co.,*

*Inc.*, 814 F. Supp. 2d 344, 353 (S.D.N.Y. 2011) and *Abu Dhabi Commercial Bank v. Morgan*

*Stanley & Co.*, 888 F. Supp. 2d 431, 451-452 (S.D.N.Y. 2012), those Courts found that the subject

statements in offering documents were not attributable to the Morgan Stanley underwriter, sponsor

and/or depositors because – unlike the RBS Materials – the face of the offering documents

expressly disclaimed such attribution, stating (a) that other parties (*e.g.*, ratings agencies) were

responsible for the statements therein and (b) that Morgan Stanley had not verified the information

therein and was not responsible for its accuracy.  *See Employees' Ret. Sys.*, 814 F. Supp. 2d at 353;

---

[6] As such, contrary to RBS's assertion, the *Dexia* Court did not dismiss the claims because "the defendants either did not make the subject statements or were, as here, merely reporting data provided by third parties."  *See* RBS Br. at 11.

*Abu Dhabi*, 888 F. Supp. 2d at 452.  The remaining cases relied upon by RBS for its mere-pass-along argument are just as inapplicable.

To attempt to further distance itself from its conduct with respect to the RBS Materials, RBS also resorts to factually mischaracterizing the contents of those documents and the record.  With respect to the Loan Tape and the Term Sheet, RBS repeatedly claims that Assured has "conceded" that WMC was the source of the data on the Loan Tape (RBS Br. at 1, 11, 13), but nowhere does the Amended Complaint contain such an allegation.  In fact, Assured has alleged that an RBS employee authored and/or modified the Loan Tape prior to its presentment to Assured.  Compl. at ¶ 46.  RBS further contends, without any legal authority, that neither the Loan Tape nor the Term Sheet can be attributed to RBS because Assured has not alleged an "affirmative statement by RBS warranting the accuracy of the Loan Tape data."  RBS Br. at 12, 13.  The argument is a straw man.  RBS need not have made such an affirmative warranty in order to be deemed to be making the representation to Assured when tendering the Loan Tape that had RBS's name and fingerprints all over it.  Further, Assured's allegations that RBS knew certain material data on the Loan Tape was false but failed to disclose that to Assured is more than enough.  *See* Point III.B. *infra*.

With respect to the Prospectus Supplement, RBS contends, again without legal authority, that the relevant statements therein actually are attributable solely to WMC, not to RBS.  RBS Br. at 12-13.  However, giving Assured the benefit of every inference on a motion to dismiss, it is not at all clear that prefatory language in a section of the Prospectus Supplement given to Assured *by RBS* means RBS cannot be held liable for common law fraud based upon its contents presented for reliance by Assured.[7]  Using a revealing "*cf.*" citation, RBS tries to suggest that *Janus Capital*

---

[7] More specifically, the statement in the Prospectus Supplement that the loan data presented therein is "*based on* servicing records and  representations about the Mortgage Loans that were made by WMC" (emphasis added) permits the equally plausible inference that RBS modified or recast such information for the Prospectus Supplement, a fact issue

*Group, Inc. v. First Derivative* Traders, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011) provides authority

for its argument and insulates RBS from liability for common law fraud arising from

misrepresentations in the Prospectus Supplement.  RBS Br. at 12 n.21.  But  *Janus* has no

application here.  In *Janus*, the Court construed the meaning of the term "make" in Rule 10b-5 and

held that *under Rule 10b-5* the "maker" of the representation in a prospectus is the Fund that issued

the document, not the investment manager who drafted it.  *Id*. at 2304-05.  This holding has not

been extended beyond the 10b-5 context to ascertain the identity of the person making a

representation for a common law fraud claim.  *Fed. Hous. Fin. Agency v. Goldman, Sachs & Co.*,

No. 11-cv-6198 (DLC), 2012 WL 5494923, at *2-4 (S.D.N.Y. Nov. 12, 2012).

### B.      The Defendants' Failure to Disclose Material Information to Assured Is Separately Actionable

Aside from the affirmative misrepresentations that the Defendants made to Assured, RBS

also had an affirmative duty to disclose certain information to Assured and misleadingly failed to do

so.  By providing Assured with the RBS Materials and their contents describing the Mortgage

Loans and WMC's underwriting guidelines, the Defendants created "an affirmative duty to disclose

any material facts relating to the substance of the representation which might affect [plaintiffs']

conduct in the transaction in hand*." Striker v. Graham Pest Control Co. Inc.*, 179 A.D.2d 984, 984-

85, 578 N.Y.S.2d 719 (3d Dep't 1992); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291-92

(2d Cir. 2006) (fraud may be predicated on acts of concealment where the defendant had a duty to

disclose material information, including "where one party possesses superior knowledge, not readily

available to the other, and knows that the other is acting on the basis of mistaken knowledge").  By

the same token, under the New York Insurance Law, RBS "cannot remain silent while cognizant

---

ultimately to be resolved in discovery.  Moreover, the referenced servicing records would have emanated from the servicer, Countrywide, not from originator WMC.

that [its] insurance application contains misleading or incorrect information." *N. Atl. Life Ins. Co. of Am. v. Katz*, 163 A.D.2d 283, 284, 557 N.Y.S.2d 150, 152 (2d Dep't 1990).

As alleged in detail in the Amended Complaint, while seeking a policy from Assured and tendering the RBS Materials, RBS knew but failed to disclose to Assured that the Mortgage Loans were the result of defective, imprudent and fraudulent underwriting by WMC.  Compl. ¶ 82-98. Further, RBS was aware that its management suppressed any internal questioning of RBS's use of such defective loans in its securitizations.  *Id.* ¶ 101.  Such information undoubtedly was material to RBS's representations made through the RBS Materials.  Indeed, had Assured been aware of such facts, it would not have issued the Policy.  Compl. ¶¶ 80, 82.  As such, it was materially misleading for RBS not to have disclosed this knowledge to Assured.

### C.    Viewing RBS's Knowledge Collectively, Assured Has Sufficiently Alleged Scienter

As discussed *supra* at Point II, Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," and thus scienter need *not* be alleged with the same "who, what, when and where" particularity of the misrepresentations themselves, nor must it be alleged with particularity or to support "strong inference" of scienter under the PSLRA.

In determining whether Assured's allegations of scienter are sufficient, the Court should not, as RBS does, isolate individual allegations and determine whether, standing alone, an allegation permits the inference of scienter.  Rather, all fraud allegations must be read *together as a whole* to determine whether, in total, they sufficiently allege that the defendant knowingly misrepresented material facts to the plaintiff.  *See, e.g., In re Longtop Fin. Technologies Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 572 (S.D.N.Y. 2012) ("The inquiry is holistic, *i.e.*, the allegations going to scienter are to be evaluated collectively").  The Amended Complaint meets this standard.

And even if the PSLRA's "strong inference" of scienter standard were somehow to be held applicable here, Assured also has met the higher burden of pleading facts creating a "strong inference" that RBS knowingly made the misrepresentations detailed in the Amended Complaint. The "strong inference" standard "requires a showing that defendants had either 'motive and opportunity to commit fraud,' or allegations of 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Prickett v. New York Life Ins. Co*., 2012 WL 4053810, *7 (S.D.N.Y. 2012) (quoting *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 Fed. Appx. 679 (2d Cir. 2012)).  To create a "strong inference" of scienter by alleging recklessness, the allegations are sufficient where the plaintiff has alleged facts demonstrating the defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  "[S]securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.*  Again, even under the PSLRA standard, the analysis is a holistic one. *See Union Central*, 2013 WL 1342529, at *4 ("In scrutinizing a complaint's allegations of scienter, a court must consider the complaint in its entirety, inquiring whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, *not whether any individual allegation, scrutinized in isolation, meets that standard*") (emphasis added) (citing *Tellabs*, 551 U.S. at 323).

**1. The Defendants' Knowledge of the Falsity of Their
   Representations and Conscious Misbehavior or Recklessness**

**a. The Pervasive, Verified Level of Defects
   In the Mortgage Loans Securitized by RBS**

Distinguishing this action from many of the RMBS fraud cased cited by RBS that were filed by disgruntled investors, here there exists forensic documentation that virtually every one of the Mortgage Loans was securitized by the RBS Defendants in Soundview despite their knowledge of false data and the wholesale abandonment of prudent underwriting guidelines.  In the aftermath of the widespread Mortgage Loan payment defaults, Assured arranged for an audit of 1,580 of the 1,593 Mortgage Loans.  Compl. ¶ 73.  The audit revealed a staggering level of non-compliance with the underwriting guidelines, as ___**91%**___ of the Mortgage Loans were found to violate those guidelines. Compl. ¶¶ 73-74 & Ex. A.

Allegations regarding demonstrably high breach rates and pervasive non-compliance with underwriting guidelines, like those here, support the inference that Defendants' representations to Assured were false and made with scienter.  *See MBIA v. Morgan Stanley*, No. 29961/10, 2011 WL 2118336, at*4-5 (Westchester Cty. June 24, 2011) ("The Complaint details the results of MBIA's forensic review which found a level of material discrepancies from the requirements of the Seller's Guide so significant that one can infer Morgan Stanley's pre-contractual representation to have been false. . . .  So too the allegations of the mortgage loans material and pervasive non-compliance with the Seller's underwriting Guide and the mortgage loan representations are sufficient non-compliance from which Defendant's scienter can be inferred").  None of the cases cited by RBS regarding a plaintiff's failure to sufficiently allege scienter concerned a transaction showing such a pervasive disregard for basic loan origination criteria – which here is confirmed by an actual,

individual loan-level review.  The inference of RBS's knowledge in this case is, therefore, fundamentally different.

### b.  The Defendants Stuffed Their RMBS Deals With Mortgage Loans They Knew Were Defective

As part of RBS's review of mortgage loans before including them in securitizations, RBS routinely engaged third-party due diligence firms to review the loans and determine whether they complied with applicable underwriting guidelines.  Compl. ¶ 87.  Instead of using that review to purge non-compliant mortgage loans from their securitizations, however, RBS regularly "waived" into their securitizations mortgage loans that the diligence firms had forensically determined were noncompliant.  *Id.* ¶ 88.  Clayton Holdings, Inc. ("Clayton"), one such diligence firm that RBS used, confirmed to Congress that – during the same time frame as the Soundview transaction – RBS included in its securitizations 53% of the mortgage loans that Clayton had determined were noncompliant, regardless of the loan defects.  *Id.* ¶¶ 90-91.  (To the extent the Court considers the Release and its subject matter, RBS has by its own admission engaged in a similar loan due diligence practice with respect to the Soundview transaction.)  The fact that RBS regularly included loans identified during diligence reviews as noncompliant in the deals in which it engaged Clayton is strong circumstantial evidence that RBS was aware such mortgage loans were included in the Soundview transaction.  *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 643-44 (S.D.N.Y. 2012) (considering the Clayton report from the FCIC and ruling "the allegations in the Complaint collectively supply sufficient circumstantial evidence from which the Court could reasonably infer Defendants' recklessness").[8]

---

[8] RBS's reliance upon *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.* (RBS Br. at 17 n.31) is misplaced. There the Court did not rely on the Clayton testimony before the FCIC to find allegations of scienter because it concerned a time period well *after* the securitization at issue.  821 F. Supp. 2d 616, 622 (S.D.N.Y. 2012) ("Because the Clayton Report is dated 2007, it cannot support a fraud claim for securities sold in March of 2006").

Further supporting allegations that RBS Securities knowingly included noncompliant mortgage loans are the statements of confidential witness ("CW") 11, a former Clayton employee interviewed by Assured. *Id*. ¶ 93.  CW 11 stated that RBS Securities made clear to Clayton that if Clayton's loan file reviewers determined that too many mortgage loans failed to comply with underwriting standards, RBS would switch to other diligence firms to review RBS's mortgage loans. *Id.* ¶ 94.  That pressure resulted in diligence firms regularly passing noncompliant loans that had significant problems and "bad credit quality." *Id.*  CW 11 himself was denied a cash "bonus" after failing too many mortgage loans, and RBS Securities specifically forbade him from reviewing mortgage loans for any more of its deals. *Id.* ¶ 95.

### c.  Assured's Other Confidential Witnesses Further Attest to RBS's Pre-Policy Knowledge of Defective Loans in Soundview

Assured has also spoken to a number of additional confidential witnesses, identified in the Amended Complaint as CW 22, CW 44 and CW 55.  Statements made by these witnesses to Assured support the inference that RBS knowingly included defective mortgage loans in the Soundview transaction.  Compl. ¶¶ 100, 101, 103.   These witnesses have confirmed that RBS employees were not allowed to discuss the quality of mortgage loans included by RBS in its securitizations, that RBS was aware as early as 2005 that the credit quality of the mortgage loans it was securitizing was declining, and that Soundview itself was "one of the worst" of all RMBS deals and was "really a piece of garbage." *Id.*[9]

In response to such incriminating insider information, RBS contends it is "unfair" for Assured to "rely blindly at the pleading stage primarily on confidential witness statements from another case to meet its pleading burden" (RBS Br. at 19) and that Assured's witness statements

---

[9] RBS's assertion that CW 22's statement is merely a "backward looking opinion . . . years after Assured issued the Insurance Policy" (RBS Br. at 18) finds no support in the Amended Complaint (*see* Compl. ¶ 100) and appears made up out of whole cloth.

should be given *no* weight because "[t]here is no suggestion that counsel in this action has spoken with these confidential witnesses or even know who they are."  RBS Br. at 18-19.  To the contrary, with the exception of CW 33 who is quoted from his statement in another case,[10] Assured has these witnesses' names and Assured's agents have spoken directly with them for this case.

In addition, and contrary to RBS's claims, "[a] plaintiff is not required to reveal the identity of confidential sources at the pleading stage.  Rather, to satisfy pleading requirements, the confidential sources need only be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"  *380544 Canada*, 544 F. Supp. 2d at 224 (internal citations omitted).  That is precisely what Assured has done in the Amended Complaint.

### d.  Governmental Investigations and Settlements with RBS

Just two days after Assured filed its initial Complaint in this action, which was reported widely by Bloomberg News the same day it was filed, the SEC staff issued a Wells notice to the Defendants' parent, the Royal Bank of Scotland Group plc, stating that the staff was considering recommending that the SEC initiate an enforcement proceeding relating to the due diligence conducted by its affiliates (*e.g.*, RBS) *in connection with a 2007 offering of residential mortgage-backed securities* and corresponding disclosures.  The time period of the SEC's investigation and the Wells notice correspond precisely with the time period covered by the Soundview transaction. Compl. ¶¶ 104-05.  The SEC has been investigating those practices since September 2010 informally, and formally since November 2010.  *Id.* ¶ 104.  RBS Financial Products has also settled

---

[10] In any event, "[t]he Court must accept Plaintiffs' allegations in the Complaint as true, regardless of whether the allegations are taken from a complaint in another case.  It is not the burden of the plaintiffs to show that it is permissible for them to quote accounts of confidential sources from a separate proceeding . . . ."  *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 224 (S.D.N.Y. 2008); *see also Union Central*, 2013 WL 13242529, at *5 n.8 ("Defendants argue that Plaintiffs may not rely on factual allegations from other complaints in support of their claims. There is no such absolute rule").

lawsuits with the States of Massachusetts and Nevada relating to the abusive practices through which its loans were originated. *Id.* ¶¶ 106, 107. "Certainly, courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter." *In re Gentiva Sec. Litig.*, 10-cv-5064, 2013 WL 1200334, at *24 (E.D.N.Y. Mar. 25, 2013) (citing *In re Bristol Myers Squibb Co. Secs. Litig.,* 586 F.Supp.2d 148, 168 (S.D.N.Y.2008)). Accordingly, such investigations and related settlements "may be considered by the Court as part of its analysis" here. *Id.*

Contrary to RBS's assertions, Assured does not attempt to "meet its burden by recycling allegations from other cases against RBS" or "rely on complaints in other actions that have been dismissed, settled, or otherwise not resolved. . . ." RBS Br. at 17-18. The Amended Complaint cites actual governmental actions that resulted in settlements on the merits and information about SEC actions that the Defendants' corporate parent itself acknowledged in its own SEC filing. *See*, *e.g.*, Compl. ¶¶ 103-107. Assured does not simply assert conclusory allegations drawn from other unsettled complaints. Thus, Defendants' reliance upon *RSM Prod. Corp. v. Friedman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009); *Footbridge Ltd. v. Countrywide Home Loans, Inc.,* 2010 WL 3790810 at *5; and *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) is entirely misplaced.

### e.  The Defendants' Long-Standing Relationship with WMC and Knowledge of its Underwriting Practices

The Defendants' close relationship with WMC, their series of agreements for the purchase of WMC-originated mortgage loans, their access to WMC loan files across a number of deals, and their pressure on third-party audit firms not to fail WMC mortgage loans are all strong circumstantial evidence that RBS was aware that WMC mortgage loans – including the Soundview

Mortgage Loans – were not compliant with WMC's underwriting guidelines and were rife with false data, as shown by Assured's own loan-level review.  Compl. ¶¶ 96-98.

Defendants rely upon two cases to support their claim that the close relationship between the Defendants and WMC cannot support an inference of RBS's knowledge that defective loans were included in the Soundview transaction.  RBS Br. at 16 (citing *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 257 (6th Cir. 2012) and *Woori Bank v. RBS Secs. Inc.*, 910 F. Supp. 2d 697, 704 (S.D.N.Y. 2012)).  However, as RBS's characterizations of these cases alone make clear, neither case involves the kinds of allegations at issue here.  Assured has conducted a loan-level review of almost all the Mortgage Loans and Assured has identified more than one thousand loans for which RBS's securitization partner, WMC, abandoned its underwriting guidelines.  In contrast, the plaintiffs in those RBS-cited cases tried to tie broad, generalized allegations of fraud to the specific loans at issue in their cases.  *Republic Bank & Trust Co.*, 683 F.3d at 257 ("Republic does not connect the underwriters' alleged failure to follow their underwriting standards to the loans and securities involved in this case. . . .  This allegation deals only in probabilities"); *Woori Bank*, 910 F. Supp. 2d at 704 (S.D.N.Y. 2012) (in case involving allegations of fraud regarding sale of CDO, plaintiff "attempt[ed] to ascribe general conduct, supported by third-party reports, to the disclosures" that failed to satisfy Rule 9(b)).  Thus, neither case is instructive here.

### f.  Astronomical Default Rates in Soundview

According to the Soundview Trustee's June 25, 2013 report, the Mortgage Loans have suffered realized losses of approximately $157 million, or 39% of their original principal balance.  Sixty-one percent (61%) of the remaining Mortgage Loans are 60 days or more delinquent.  Such astronomical default rates are also a strong indicator that WMC, RBS's frequent source of loans for RMBS securitizations, did not originate the Mortgage Loans in compliance with its underwriting

guidelines and adds to the circumstantial evidence supporting RBS's knowledge of the widespread

problems with the Mortgage Loans.

### 2.   The Amended Complaint Also Sufficiently Alleges RBS's Motive and Opportunity to Defraud Assured

Whether under Rule 9(b)'s scienter standard, or under the "motive and opportunity" test to

satisfy the heightened pleading standard for scienter under the PSLRA (*see supr*a at Point II;

*Prickett v. New York Life Ins. Co.*, 2012 WL 4053810, *7 (S.D.N.Y. 2012)), Assured's motive and

opportunity allegations in the Amended Complaint satisfy both standards.

"Regarding the 'opportunity' prong, courts often assume that corporations, corporate

officers and corporate directors would have the opportunity to commit fraud if they so desired." *In*

*re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 281 (S.D.N.Y. 2006) (citing *In re Time Warner Sec.*

*Litig.*, 9 F.3d 259, 269 (2d Cir.1993)).  Indeed, given that the Defendants collectively controlled the

Soundview securitization process (Compl. ¶¶ 36-39), there is no question that the Defendants could

have knowingly included fraudulently originated mortgage loans in the Soundview transaction, and

the Defendants do not even argue to the contrary.  *See* RBS Br. at 13-19.

With respect to motive, the Defendants argue that "Assured's allegation that RBS 'reaped

outsized profits from RMBS activities' does not satisfy Rule 9(b)."  RBS Br. at 17; Compl. ¶ 83.

However, Assured pleads much more about all three Defendants' motives to deceive Assured about

the true quality of the Mortgage Loans, including that RBS Securities would not have been able to

sell the Certificates without the Policy, and in that case all three RBS entities would have had to

potentially bear the risks associated with the defective Mortgage Loans, including financial loss and

its consequences.  Compl. ¶ 99.  Allegations regarding a defendant's motive to avoid financial loss

suffices by itself to satisfy motive under Rule 9(b).  *See*, *e.g*., *Glidepath Holding v. Spherion Corp*.,

590 F. Supp. 2d 435, 455 (S.D.N.Y. 2007) (ruling that "a business seeking to *avoid a loss* or *induce*

*a beneficial sale* has sufficient motive to commit fraud to raise the requisite 'strong inference' of fraud under Rule 9(b)").

      **D.**        **Assured Properly Pled Reliance on the RBS Materials**

              **1.**        **Assured's Actual Reliance**

Virtually conceding that Assured adequately has alleged its reliance upon RBS's representations with respect to the RBS Materials, the thrust of RBS's actual reliance argument is, instead, that any such reliance by Assured is contractually barred by the Release.  RBS Br. at 20.[11] By its terms, the Release was executed in connection with RBS providing Assured with third-party mortgage loan due diligence that RBS had not independently verified for accuracy, and which did not contain all of the information Assured would need in order to perform its analysis of whether to issue the Policy.  Hail Decl. Exh. D at 1; *supra* at Point I.B.  So that Assured would not place undue weight on such information and base its decision solely upon such unverified third-party report, Assured further agreed that it "w[ould] make its own independent assessment of the merits and risks of the Transaction."  *Id.*  RBS now tries to conflate that limited agreement into a general disclaimer of reliance, far beyond its natural meaning and intent.  All that Assured agreed in the provision was to perform its own assessment of the Soundview transaction instead of just relying solely upon the "Information" without verification and supplementation from, for example, the RBS Materials.

To try to buttress its unduly broad reading of the Release, RBS relies on three cases involving contracts that include specific release and non-reliance language, but none of these cases

---

[11] RBS questions in passing the adequacy of Assured's actual reliance allegations with respect to the Prospectus Supplement, claiming the Amended Complaint does not allege with particularity the specific statements on which Assured relied.  That is incorrect.  *See* Compl. ¶¶ 55, 66.  And in the only case cited by RBS for the proposition, *Devaney v. Chester,* 709 F. Supp. 1255 (S.D.N.Y. 1989), the court found a failure of particularity in a *fourth* amended complaint after the plaintiff Trustee had had the benefit of significant discovery).  *Id.* at 1257-58.  That is not this case.

involves language at all similar to that in the Release.[12]  In addition, even if the terms of the Release

did apply, Assured "may not be precluded from claiming reliance on misrepresentations of facts

peculiarly within the seller's knowledge, notwithstanding the execution of a specific disclaimer."

*Steinhardt Group Inc. v. Citicorp*, 272 A.D.2d 255, 257, 708 N.Y.S.2d 91, 93 (1st Dep't 2000)

(emphasis added); *see also Swersky v. Dreyer & Traub*, 219 A.D.2d 321, 326-29, 643 N.Y.S.2d 33,

36-37 (1st Dep't 1996); *Superior Technical Resources, Inc. v. Lawson Software, Inc.*, 17 Misc. 3d

1137(A), 851 N.Y.S.2d 74, 2007 WL 4291575, at *11 (Sup. Ct. Erie Co. Dec. 7, 2007).  Given that

Assured lacked any access to the Mortgage Loan files and the Defendants did, and for the reasons

discussed *supra* at 24-25, WMC's complete abandonment of origination standards in those

Mortgage Loans was "peculiarly" within the Defendants' knowledge.  At a minimum, RBS's

contention raises a factual dispute regarding the parties' intent that is inappropriate for resolution on

a motion to dismiss.

### 2.   <u>Assured's Reasonable Reliance</u>

It is black letter law that the determination of whether a plaintiff alleging fraud reasonably

relied upon the misrepresentations at issue is highly fact-specific and cannot properly be determined

on a motion to dismiss.  *See, e.g., Robinson v. Deutsche Bank Trust Co. Americas*, 572 F. Supp. 2d

319, 322 (S.D.N.Y. 2008) ("[w]hether or not reliance on alleged misrepresentations is reasonable in

the context of a particular case is intensely fact-specific and generally considered inappropriate for

determination on a motion to dismiss") (citation and internal quotation marks omitted); *Maloul v.*

---

[12] Specifically, Defendants rely upon *Chase Manhattan Bank v. New Hampshire Ins. Co.*, 759 N.Y.S.2d 17 (1st Dep't 2003) ("fraud claims cannot be brought by a contracting party where *specifically disclaimed reliance* on extra-contractual representations and indicated that it would make its own investigation of the risks involved") (emphasis added); *MBIA Ins.Corp. v. Merrill Lynch*, 916 N.Y.S.2d 54, 55 (1st Dep't 2011) (no fraud claim where investor had agreed in investment contract not to rely on CDO underwriter's advice in evaluating whether to invest); and *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 63 (1st Dep't 2012) (wherein the release stated that plaintiff acknowledged and agreed that defendant was not acting as plaintiff's fiduciary, financial or investment advisor, that plaintiff was not relying on defendant for any advice, counsel or representations, and that plaintiff had consulted with its own advisors and made its own investment decision based upon its own advisors' advice and "not upon any view expressed by [defendant]").

*Berkowitz*, No. 07-cv-8525, 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008) (same).  Therefore, as a threshold matter, whether Assured reasonably relied on the representations and information provided by the Defendants in the RBS Materials should not be decided on the pleadings alone.

Trying to side-step the fact issues that pervade the question of reasonable reliance, the Defendants principally argue that Assured's reliance was unreasonable as a matter of law because Assured was a "sophisticated party" that "failed to make use of the means of verification available to it, such as reviewing the files of the other parties."  RBS Br. at 21 (citing *UST Private Equity Inv. Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (1st Dept. 2001)); *see also* RBS Br. at 19 n.41 (citing *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) for the proposition that "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance").  RBS's argument fails for a number of reasons.

*First*, unlike the plaintiffs in *UST* and *Grumman*, Assured did not "enjoy access to" individual loan files for the Mortgage Loans.[13]  In fact, Assured had no legal right whatsoever to such information, and RBS never offered Assured any access to it.  *See*, *e.g.*, Compl. ¶¶ 35, 51, 72. There were no "files of the other parties" that Assured can be said to have failed to obtain.  As such, Assured undertook reasonable and standard due diligence to underwrite the purported risk of insuring the Certificates.  *See infra* at 31-32; Compl. ¶¶ 56-65.

*Second*, even assuming *arguendo* that Assured had a right to access loan-level information from RBS, New York's First Department recently held in *CIFG Assurance North Am., Inc. v. Goldman, Sachs & Co.*, 106 A.D.3d 437 (1st Dep't 2013) that a monoline insurer is not required to perform a pre-policy audit or sampling of individual mortgage loans in order to have reasonably

---

[13] In *Grumman*, the plaintiff's pre-closing access to documents and records was "unfettered."  748 F.2d at 737.

relied upon the representations made by the RMBS securitization sponsor, depositor and underwriter.  *Id.* at 438 (reversing trial court decision in *CIFG Assurance North Am., Inc. v. Goldman, Sachs & Co.*, Index No. 652286/2011, 2012 Misc. LEXIS 3986 (N.Y. Co. May 1, 2012)), which had granted Goldman Sachs' motion to dismiss based upon the monoline insurer's failure to exercise an acknowledged contractual right to access and sample loan files prior to issuing its financial guaranty insurance policy).  Moreover, in *CIFG*, the monoline insurer "undertook extensive due diligence of the Loan originators and proposed Loan servicers, analyzed the collateral characteristics of the Loan portfolio and analyzed the deal structure, including the risk of widespread losses to CIFG in the event of various adverse events."  *CIFG*, 2012 Misc. LEXIS 3986, at *4-5.  Assured essentially performed the same analysis.  *See infra* at 32-33; Compl. ¶¶ 56-65.[14] The First Department nevertheless predictably held that "[u]nder the circumstances, there is a question of fact as to whether plaintiff reasonably relied on defendants' representations" and remanded the action back to the trial court for discovery.  *CIFG*, 106 A.D.3d at 438.[15]

RBS next argues that, by virtue of having received from RBS in May 2007 the third-party loan-level diligence study pursuant to the agreed terms of the Release, "Assured was in possession of the very diligence it claims should have put RBS on notice" and thus knew the same thing that RBS knew.  RBS Br. at 21.  This argument is completely erroneous.  Nowhere does the Amended Complaint allege that the third party due diligence review that RBS had commissioned for

---

[14] In light of such analysis performed by Assured, RBS's assertion that "[r]easonable reliance [by a sophisticated party] requires more than blind acceptance" (RBS Br. at 21) has no application here.  It also is worth noting that it would have been commercially impracticable for Assured to have sought the Soundview loan files to perform a loan-level audit of all (or even most) of the Mortgage Loans prior to issuing the Policy.  Whereas RBS wanted to obtain the Policy within 2-3 weeks of first contacting Assured, it took 14 people working 3 months to perform such a review once the widespread loan defaults emerged.  *See* Compl. ¶¶ 44, 72.

[15] Apparently aware that *CIFG* undermines its reasonable reliance argument, RBS tries to distinguish the case on the ground that the plaintiff in CIFG performed much more due diligence than Assured did.  RBS Br. at 21 n.45.  As discussed above, not only is that incorrect, but the very fact that RBS makes the argument further illustrates that, at a minimum, fact issues for discovery abound.

Soundview is what put RBS on notice of the pervasive defective loans in the Group II Mortgage Loan pool.[16] RBS once again improperly asserts facts not alleged in the Amended Complaint or contained in the documents referenced therein.  Furthermore, RBS's continually confused and mistaken recitation of purported facts surrounding the third-party loan review that RBS commissioned for Soundview – and the Release that Assured signed to obtain a copy of it – only highlights that RBS's reliance upon facts extrinsic to the Amended Complaint raises more questions than it answers, namely: (i) What loan review was actually commissioned by RBS?; (ii) What vendor performed the review, Clayton or someone else?[17]; (iii) Which review report was provided to Assured?; (iv) What did the report given to Assured show about the Mortgage Loans?; and (v) How did the contents of the report given to Assured compare to what the RBS Materials said about the Mortgage Loans?  RBS forgets that, on a motion to dismiss, it is Assured's allegations in the Amended Complaint which are to be taken as true, not RBS's misstatement of what is contained in the Amended Complaint.

RBS also argues that Assured failed to perform its own "independent" analysis of the Soundview transaction.  RBS Br. at 21.  However, the allegations contained in the Amended Complaint make clear that Assured performed just such an analysis.  Specifically, Assured performed two quantitative analyses that were central to Assured's decision whether to issue the Policy: an expected loss model ("Loss Model") and a cash flow analysis.  The Loss Model projected losses on all the Mortgage Loan collateral backing the Certificates based upon the Mortgage Loan data provided by RBS in the Loan Tape and Term Sheet, specifically each borrower's DTI, the

---

[16] Instead, Assured alleges that one of the sources of RBS's knowledge of the abandonment of WMC underwriting guidelines, and an example of RBS's persistent disregard for such fact, was RBS's practice of overriding more than half of the Clayton diligence firm's recommendations to remove defective loans from the securitization at hand.  Compl. ¶¶ 87-92.

[17] *See* RBS Br. at 6-7 (referring to the reports as "prepared by Clayton (*and another due diligence vendor*)") (emphasis added).

LTVs and CLTVs for each Mortgage Loan, and each borrower's FICO score.  Compl. ¶¶ 56, 58.
The cash flow analysis performed by Assured projected, under various scenarios, the payments the
Soundview trust would receive from interest and principal payments on the Mortgage Loans, and
how such funds would be distributed among the Certificate tranches pursuant to the Soundview
payment waterfall.  Compl. ¶¶ 56, 59.  The information in the Loan Tape and Term Sheet is part of,
but not the only data in, that model.  *Id.*  Assured's additional diligence that it used to evaluate the
Soundview transaction included, *inter alia*, resolution of certain issues related to the ability to
foreclose on defaulted properties, a review of historical loss levels for other RMBS offerings
involving WMC mortgage loans, and the pre-Policy ratings of the Certificates provided by RBS
from S&P's, Moody's and Fitch's.  Compl. ¶¶ 62-65.

Finally, RBS also contends Assured's reliance was unreasonable based upon purported
cautionary language in the Term Sheet and Prospectus Supplement.  RBS Br. at 22-23.  Notably, the
"RBS" Loan Tape contains absolutely no disclaimers and the Defendants do not even attempt to
argue to the contrary.  Regardless, RBS's argument regarding the supposed cautionary language in
the Term Sheet and Prospectus Supplement also fails for a number of reasons.

*First*, the Term Sheet contains standard securities sale disclaimers that are irrelevant to
Assured's reasonable reliance on the information contained in it.  *See* Hail Decl. Exh. 3 at 3.  Unlike
disclaimers usually contained in a Prospectus Supplement regarding mortgage loan origination
practices, the Term Sheet disclaimers merely make clear that it is not a final offering document.  *Id.*
For example, the Term Sheet includes statements such as "[t]his free writing prospectus is being
delivered to you solely to provide you with information about the offering and to solicit an offer to
purchase the offered securities" and "[t]his free writing prospectus is not required to contain all of
the information that is required to be included in the base prospectus and the prospectus

supplement." *Id.* Such cautionary language in no way speaks to WMC's complete failure to follow its mortgage loan underwriting practices.

*Second*, courts have routinely held that broad disclaimers do not bar claims like Assured's here. *See*, *e.g.*, *In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768-69 (S.D.N.Y. 2012) ("No language in the Offering Documents disclosed, for example, that the originators had systematically violated their own stated underwriting standards, that exceptions were improperly granted, or that Bear Stearns had directed its third-party due diligence firms to keep non-conforming loans in the Offering pools"); *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,* 159 F.3d 723, 729 (2d Cir. 1998) ("cautionary language . . . must relate directly to that by which the plaintiffs claim to have been misled"); *M & T Bank Corp. v. Gemstone CDO VII, Ltd.*, 23 Misc. 3d 1105(A), 881 N.Y.S.2d 364 (Sup. Ct. 2009) ("In the absence of specific language addressing the representations made both orally and in writing, and specifically addressing the complaints by Plaintiff with respect to the quality of the collateral and the adequacy of HBK's underwriting, the disclaimers in the documents do not negate the reliance factor as a matter of law") (citations omitted).[18] Finally, "[a]t most, the disclaimers, and their effect on [the plaintiff], present an issue of fact to be considered at trial in vetting [plaintiff's] reliance." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 39 Misc. 3d 1220(A) (N.Y. Sup. Ct. 2013). The law is clear that the supposed cautionary language in the Term Sheet and Prospectus Supplement does not support dismissal of Assured's claims at this stage.

---

[18] Moreover, as discussed above, RBS's boilerplate disclaimer language does not bar Assured's common law fraud claim because "even a specific disclaimer of reliance is insufficient to bar a fraud claim where the facts misrepresented are '*peculiarly within the [seller's] knowledge*.'" *See* Point III.D.1, *supra*.

**IV.**     <u>**Assured Has Adequately Pled A Violation of New York Insurance Law § 3105**</u>

Assured also has stated an independent claim for damages under New York Insurance Law §

3105.  This is not an investor fraud case arising from the purchase of RMBS securities, but rather a

claim by a monoline insurance company that was induced to issue an insurance policy through

material misrepresentations.  Financial guaranty insurance, including the Policy, is expressly

covered by the New York Insurance Law.  *See* N.Y. Ins. L. § 6908 ("An insurer issuing policies of

financial guaranty insurance shall be subject to all of the provisions of this chapter applicable to

property/casualty insurers to the extent that such provisions are not inconsistent with the provisions

of this article").

Section 3105 of the New York Insurance Law provides, in relevant part:

> No misrepresentation shall avoid any contract of insurance *or defeat recovery thereunder* unless such misrepresentation was material.  No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such a contract.

N.Y. Ins. Law § 3105(b)(1) (emphasis added).  In construing this New York statute, New York's

First Department recently held that § 3105(b)(1) allows an insurer to recover as compensatory

damages the payments it made under a policy procured through material misrepresentations,

without resorting to rescission of the policy.  *See MBIA Ins. Corp. v. Countrywide Home Loans,*

*Inc.*, 105 A.D.3d 412, 963 N.Y.S.2d 21, 22 (1st Dep't 2013).  In *MBIA*, the Court explained:

> Contrary to defendants' arguments, the motion court was not required to ignore the insurer/insured nature of the relationship between the parties to the contract in favor of an across the board application of common law. Although the Insurance Law provides for "avoiding" an insurance policy (or rescission), *it also mentions "defeating recovery thereunder," which, logically, means something other than rescission*.  Neither defendants nor the federal cases on which they rely (see *GuideOne Specialty Mut. Ins. Co. v. Congregation Adas Yereim*, 593 F. Supp. 2d 471, 486 (E.D.N.Y. 2009) . . . ) explain why "defeating recovery thereunder" cannot refer to the recovery of *payments made pursuant to an insurance policy* without resort to rescission.

> Moreover, both cases [cited by defendants], which are from the Eastern
> District of New York, are flatly contradicted by two from the Southern
> District of New York (see *Syncora Guar. Inc. v. EMC Mortg. Corp.*, 874 F.
> Supp. 2d 328, 337 (S.D.N.Y. 2012) . . . .).

*MBIA*, 105 A.D.3d at 412 (emphasis added).

The information and data that the Defendants provided to Assured in the RBS Materials to induce Assured to issue the Policy qualify as representations under the New York Insurance Law. The statute broadly defines "representation" as "a statement as to past or present fact, made to the insurer by, or by the authority of, the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof.  A misrepresentation is a false representation, and the facts misrepresented are those facts which make the representation false."  N.Y. Ins. Law § 3105(a) (McKinney); *see also* Black's Law Dictionary (9th ed. 2009), REPRESENTATION ("[a] presentation of fact — either by words or by conduct — made to induce someone to act . . . .").

Thus, New York Insurance Law § 3105 is implicated wherever an applicant for insurance makes a misrepresentation as to any "past or present fact . . . as an inducement to the making [of the insurance contract]."  N.Y. Ins. L. Section 3105(a).  "New York law provides that an insurer has an interest in receiving complete and accurate information before deciding whether to issue a policy. . . .  Insurance is the business of pricing risk; and it cannot function efficiently if the insured conceals or misrepresents the risks a policy covers."  *Syncora Guar.,* 874 F. Supp. 2d at 334 (noting that N.Y. Ins. Law § 3105(a) defines "'representation' as 'a statement as to past or present fact, made to the insurer by . . . the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof'") (additional citations omitted).

Moreover, material misrepresentations made to procure an insurance policy need not have been made with scienter in order to trigger remedies under § 3105.  Under the New York Insurance

Law, the applicant for insurance does not even need to know that a representation made to induce the issuance of a policy is false.  Although misrepresentations made by an insured must be material to justify rescission, they may be innocently or unintentionally made.  *See*, *e.g.*, *Rafi v. Rutgers Cas. Ins. Co.*, 59 A.D.3d 1057, 872 N.Y.S.2d 799 (4th Dep't 2009); *Precision Auto Accessories, Inc. v. Utica First Ins. Co.*, 52 A.D.3d 1198, 859 N.Y.S.2d 799 (4th Dep't 2008); *Curanovic v. New York Cent. Mut. Fire Ins. Co.*, 307 A.D.2d 435, 762 N.Y.S.2d 148 (3d Dep't 2003).

Therefore, as the allegations in the Amended Complaint make plain, RBS's misrepresentations and false information provided in the RBS Materials were material as a matter of law.  *Leamy v. Berkshire Life Ins. Co.*, 39 N.Y.2d 271, 274, 347 N.E.2d 889 (1976) (ruling that "for the purpose of determining the materiality of the misrepresentations, a decedent's own understanding of their significance is irrelevant" and where those misrepresentations induced the issuance of an insurance policy, they are material as a matter of law).  While Assured has pleaded sufficient allegations permitting the plausible, even strong, inference that the Defendants knew the information they provided to Assured in 2007 was false, given Assured's findings in its subsequent loan-level audit performed in 2010, it is clear that the Mortgage Loan files were rife with untrue information and that WMC had abandoned its underwriting guidelines.  By tendering those untruths to Assured to obtain the Policy, RBS violated New York Insurance law § 3105, entitling Assured to compensatory damages in the amount of insurance claims it has paid and will pay in the future.

Remarkably, in opposition to Assured's § 3105 claim, RBS cites *MBIA* for the proposition that Assured's "only monetary remedy potentially available under § 3105 is 'rescissory damages,'" which RBS contends are not available and are in any event waived.  RBS Br. at 25.  Plainly, that is

not what *MBIA* held as set forth above, although the *MBIA* Court does separately address whether rescissory damages were alternatively available. *MBIA*, 105 A.D.3d at 413.[19]

**V.**    **RBS Fails Almost Entirely Even to Address Assured's Aiding and Abetting Claim**

Finally, the RBS Defendants fail to address meaningfully Assured's aiding and abetting fraud claim, devoting only a single footnote to the subject. RBS Br. at 24 n.57. The Defendants contend that because there purportedly is not a primary fraud claim for the reasons asserted in their motion, there can be no aiding and abetting liability. *Id.* However, for the reasons discussed above, the allegations of the Amended Complaint do state a valid claim for common law fraud.

In addition, the cases relied on by RBS in the same footnote are inapposite. In *VTech Holdings, Ltd. v. Pricewaterhouse Coopers*, LLP, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004), the court ruled that "[a]llegations that a defendant should have known of fraud are insufficient" for aiding and abetting liability. Assured has plainly pleaded that each of the Defendants knew of the fraud. *See*, *e.g.*, Compl. ¶¶ 83-107; *see also* Point III.C., *supra*. In *Gotham Boxing Inc. v. Finkel*, No. 601479–2007, 2008 WL 104155, at *13 (N.Y. Sup. Ct. Jan. 8, 2008), the Court held that to the extent the complaint intended to allege in the alternative that certain defendants aided and abetted the fraud committed by another defendant, the complaint failed to state that claim with sufficient detail to satisfy CPLR § 3106(b). In contrast, the Amended Complaint details how each Defendant actively committed fraud and assisted the others in doing so. *See*, *e.g.*, Compl. ¶¶ 83-107.

---

[19] RBS also cites *GuideOne Spec. Mut. Ins. Co. v. Congreg. Adas Yereim*, 593 F. Supp. 2d 471 (E.D.N.Y. 2009) for the incorrect (and non-binding) proposition that § 3105 does not create an independent cause of action (*MBIA* plainly holds that the statute does) and the proposition expressly rejected in *MBIA* by the New York State appellate court – the court best suited to construe a New York state statute – as incorrect and non-binding. *See MBIA*, 105 A.D.3d at 412.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Assured respectfully submits that the Defendants' motion to dismiss should be denied.

Dated:  October 4, 2012

Respectfully submitted,

_____/s/William A. Maher_____
William A. Maher
Randall R. Rainer
John E. Lazar

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300