E3HCASSC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ASSURED GUARANTY MUNICIPAL
    CORP.,
4
                    Plaintiff,
5
             v.                            13 CV 2019 (JGK)
6

7   RBS SECURITIES, INC., et al,

8               Defendants.

9   ------------------------------x
                                      New York, N.Y.
10                                    March 17, 2014
                                      2:45 p.m.
11
    Before:
12
                      HON. JOHN G. KOELTL,
13
                                        District Judge
14

15                        APPEARANCES

16  WOLLMUTH, MAHER & DEUTSCH
         Attorneys for Plaintiff
17  BY:  WILLIAM A. MAHER
         RANDALL R. RAINER
18       JOHN E. LAZAR

19

20  GOODWIN PROCTER
         Attorneys for Defendant
    BY: BRIAN D. HAIL
21       DAVE FREEBURG

22

23  ALSO PRESENT:

24  JONATHAN PERRY - RBS Representative

25

E3HCASSC

1          (Case called)

2          MR. MAHER:  Bill Maher, on behalf of plaintiff Assured

3    Guaranty.  With me is my partner, Randall Rainer and my

4    colleague, John Lazar.  I also have client representatives I

5    would like to introduce you to.  This is Edward Newman,

6    Jonathan Meyers and Michael DiRende in the first and second

7    rows.

8          THE COURT:  All right.  Thank you.

9          MR. HAIL:  Good afternoon, your Honor.  This is Brian

10   Hail from representing the RBS defendants.  With me is Dave

11   Freeburg and my client representative, Jonathan Perry.

12         THE COURT:  I suspect I know people Goodwin Procter.

13   Nothing about that affects anything that I do in the case.  I

14   don't know any of the lawyers who are actually appear on either

15   side, I don't think.  I can always be wrong.

16         Again, nothing about that affects anything that I do

17   in the case.  This is a motion to dismiss.  All it is is

18   argument.

19         MR. HAIL:  Good afternoon, your Honor.  I am Brian

20   Hail from Goodwin Procter representing the RBS defendants in

21   this case.

22         As your Honor earlier noted, we made a motion to

23   dismiss the complaint in its entirety.  I won't attempt to

24   retrace all the arguments, all the case law cited in the

25   various pleadings and briefs, but let me start with basic facts

3

E3HCASSC

about the transaction and sequence of events and lead to why

this case is unique, and how the facts interplay in some of the

case law, which might not be the world's most clear case law

out there right now.

This is a case involving an RMBS securitization.  RBS

was not the originators of these loans.  They did not

underwrite the loans or talk to the borrowers.  It purchased

the loans, packaged them together, issued them through a trust

structure to a series of note holders.

Assured, then known as FSA if you see it in the some

of the correspondence, provided a monoline wrap for one

particular monoline of these loans.  That monoline ended up

representing, it's called the class 2A1 certificates and

approximately $291,000,000 in principal.  That tranch of notes

was backed by approximately 1,500 loans as collateral.  Those

loans represent approximately $362,000,000 of collateral in

principal amount to cover that particular tranch of loans.

In connection with this deal, the first interaction

that's alleged between Assured -- I will call it Assured

through the course of the discussion -- was March 1, 2007,

where there apparently had been some discussion, a loan tape is

sent.  A loan tape is a Excel spreadsheet with loan

characteristics, LTV, CLTVs, borrower information, principal

amounts, location of mortgages, things like that.  That's in

amended complaint paragraphs 45 and 49.

E3HCASSC

```
 1          After that is sent, there is something sent to Assured

 2   called the term sheet.  The term sheet is actually attached to

 3   the Hail declaration that we put in with our motion as Exhibit

 4   B.  According to the complaint, paragraph 49, that is sent at

 5   8:26 p.m. on March 7.  It says, Per your conversation with Mr.

 6   Skeebo, attached is the term sheet and the loan tape.

 7          The very next morning Assured specifically asked for

 8   something called the CDI file and asked if the diligence on the

 9   deal will be made available.  A CDI file is a structuring file

10   that allows a party to look at the cash flows on the

11   transaction.  In essence, to see, how the waterfall structure

12   of the payment of the notes works.  RBS responded the next

13   morning, saying they would send the diligence reports after a

14   release was executed.  Within four hours Assured attaches a

15   signed release and sends it back to RBS.  The next day RBS sent

16   a series of files to Assured.  That is reflected in the Hail

17   declaration Exhibit A as that e-mail exchange.

18          Those files represent 8,000 pages of diligence

19   materials.  And rather than submit that to the Court at this

20   time, we did not include it with my declaration, but as 8,000

21   pages of loan level material, summaries -- I have a copy of it

22   in the courtroom if your Honor would like for whatever reason.

23          That diligence material is what was specifically

24   requested, and specifically contains loan level information.

25   That was forwarded after the release was executed as was the
```

E3HCASSC

1    CDI file.  The diligence information, we will come back to it

2    frequently in this case -- it is a unique feature in this case

3    that distinguishes it from other cases where courts have not

4    dismissed complaints.

5            The diligence material revealed one of two things.

6    Either there were no problems in the transaction, and Assured

7    was comfortable with it and they did the deal with knowledge of

8    the diligence results.  Or the diligence raised incredible red

9    flags that were somehow worked through and Assured did the deal

10   anyway.  In any event, Assured received the diligence

11   materials.  We know that and they have to have formed some

12   basis of their decision-making.

13           In any way, the consideration and the relevance of the

14   disclosure in the diligence materials is relevant to the claims

15   here and mandates the dismissal because of the release.

16           This case is unique for three reasons.  The first is

17   that RBS did not originate the deals.  In a great deal of the

18   RMBS cases that are cited by Assured the

19   sponsor/originator/underwriter originates the loans.  That is

20   significant because the originator has that contact with the

21   borrower, has that knowledge of the underlying guidelines, has

22   knowledge of the process that's involved.  That third-party

23   basis that we are not the originator has been the distinction

24   of several courts that have indicated that there is no special

25   relationship, for example, duty to disclose information or

E3HCASSC

1    knowledge of underlying guidelines.  Particularly in a case,

2    for example, in the *Union Central* case, about the quality of

3    the representations made.

4         THE COURT:  Putting aside the duty to disclose, they

5    allege misrepresentations, not just a failure to disclose, and

6    they say that although you try to distance yourself from the

7    preparation of the loan tape and the term sheet, your

8    fingerprints were over the loan tape and the term sheet, and

9    you passed it on to them with your logo, your signature, in

10   effect, and they relied on those documents.

11        MR. HAIL:  I will say two things about that.  The

12   first is as to the loan tape, it's origination material.  That

13   undoubtedly comes from WMC.  They knew that and they allege --

14   they took that data and modeled other WMC data.  The prosup

15   then says specifically that data came from WMC.

16        THE COURT:  Yes, but you passed it on allegedly with

17   your own logo, which they say you knew were not correct.

18        MR. HAIL:  Your Honor, there is two things.  The first

19   is the knowledge and the scienter part about whether or not we

20   knew it was correct.  I think that will be clear when we get to

21   that.  We told them it was WMC data.  We specifically disclaim

22   making representations about it.  It is very clear who makes

23   what representations.  Those are carefully negotiated in any

24   RMBS deal, whether there is a no fraud rep, whether there is a

25   representation by the sponsor that it backstops the

E3HCASSC

originator's representations.  They undoubtedly have the

benefit of the originator representations as to the quality of

the loan data.  What we then represent and stand behind is

specifically negotiated, was specifically referred to in the

prosup.

THE COURT:  You're referring to the supplemental

prospectus as to what you said.

MR. HAIL:  Exactly.  That refers to a different

agreement for the specific representations we made.

THE COURT:  But there is no specific representation

with respect to the loan tape and the term sheet that you give

to them and that they allegedly rely on.  The supplemental

prospectus may have its own clarification and specific portions

as to what you're saying and what the originator says, but

there is nothing like that in the loan tape or the term sheet.

MR. HAIL:  There is two things.  Let me focus on the

loan tape.  That's a series of data.  It is numbers and it's

number crunching.  There is not a specific disclaimer.  It's an

XL spread sheet file.  Those are loan characteristics which

they knew came from WMC.  They know that because that's what

they said they did, they modeled WMC deals.  They didn't model

RBS deals.

For the term sheet, the term sheet, the second page

says, Originator, WMC mortgage corporation.  The term sheet

also contains disclaimers in the front of it which say

E3HCASSC

1    specifically this is preliminary.  The second one says if you

2    get a prosup, the prosup supersedes and replaces the

3    information and refer to the prosup.  I think the prosup makes

4    it perfectly clear that the information the source of all the

5    loan data, the source of the information, is WMC itself.

6          The question is, did we misstate what the originator

7    told us?  That was the analysis that was done in *Union Central*.

8    We can look at that.  We didn't make a misrepresentation

9    because we are reporting back.  WMC told us this loan data.  We

10   then told it to third parties.  The question as defined in the

11   *Union Central* case is, did we misstate what was said to us by

12   the originator.  That is relevant both to the misrepresentation

13   piece and also to the scienter piece, because there is no

14   allegation we knew that that information -- there is no

15   factual -- specific factual allegations.

16         THE COURT:  I thought that, in fact, they do allege

17   that you knew that the loans were not collectible in the degree

18   to which they should have been collectible, because you knew

19   that the quality of the loans was far less than would otherwise

20   meet the underwriting standards of the originator.

21         MR. HAIL:  There is no specific factual information

22   that tie any of that scienter to the specific loans in this

23   transaction, and the specific nature of this underwriting in

24   these loans.  They do have a whole section on scienter which we

25   can get to later which talks about the Clayton trending

9

E3HCASSC

1    reports, which talks about other lawsuits, that talks about

2    other things that allegedly provide scienter.  Not a single one

3    of those allegations ties to this transaction, to these loans.

4         The only specific thing we know is the diligence

5    report in this case, the diligence report that showed what the

6    evaluation of the underwriting materials was, the compliance

7    with guidelines, things like that.  That was shared with them

8    specifically.

9         This case is different, I said for three reasons.  The

10   first of which is the fact that we were not the originator.

11   The passing of the information and our knowledge of that

12   information is significant.

13        In a recent decision Judge Torres -- this is after the

14   briefing in the case -- this is 2013 WL 6667601, and it's

15   Deutsche zentral-genossenschaftsbank -- which I will call DZ

16   Bank v. HSBC, December 17, 2013.  The court found where it's a

17   third-party deal, even that case the subsidiary originated some

18   of the loans, if the underwriter itself did not actually look

19   at the loans and possess the information, there is nothing that

20   suggests that, in fact, they knew the information was wrong.

21   You need to have a specific tie to the specific loans in the

22   case to the specific underwriter that tells somebody at RBS's

23   position that the loans are bad, that they weren't written

24   within the guidelines.  The only thing in this case that would

25   provide the best evidence of that is the diligence material.

E3HCASSC

1    In this case we disclosed the diligence material to them.  They

2    don't allege that we disclosed the diligence material, but the

3    distinction in the case -- and that's the second major

4    distinction in this case -- is that there is no allegation that

5    we failed to disclose the diligence materials.  If you look at

6    any number of our RMBS cases, particularly on the seller's

7    side, the allegation is that the sponsor underwriter did not

8    disclose what the diligence reports it knew in its files.

9            THE COURT:  What did Judge Torres eventually do it

10   with the motion?

11           MR. HAIL:  She dismissed the complaint.

12           In that situation, where the court finds that the

13   knowledge contained in the diligence report is significant,

14   it's evidence that you knew something was wrong with the loan

15   pool.  In fact in this case we disclosed that same information.

16   The distinctions in the cases finding scienter is the diligence

17   in this case was, in fact, disclosed.  I'm only aware of one

18   case where a sponsor was held -- a fraud claim survived where

19   the diligence had been disclosed.  It was *MBIA v. Countrywide*.

20   In that case, in fact, the allegation was the representations

21   were made about the diligence and what you would do with the

22   diligence.  That, in fact, the loans were not then kicked out,

23   that the diligence problems were not then solved.  Other than

24   that, I'm not aware of a case where the diligence has been

25   shared with the third party, with a monoline and in fact

E3HCASSC

1    there's been evidence of scienter found.

2              The third reason in this case, which makes it unique,

3    is the release.  In this case to get the diligence materials we

4    required the execution of an acknowledgment and a release.  The

5    release is very broad.  It is not limited to the contents of

6    the diligence itself.

7              THE COURT:  You begin your papers with the argument

8    from the release.  The release was not pleaded as part of the

9    complaint.  It was not referred to in the complaint.  It's not

10   integral to the complaint.  I couldn't rely on it without

11   turning it into a motion for summary judgment.

12             I know you make an argument that the complaint was

13   deliberately drafted to avoid reference to the release, but

14   that's not really true.  They are certainly not relying on the

15   release as the basis for their arguments in the complaint.

16   They are just not.  The release is a defense, which would

17   normally be pleaded in an answer, and then you would have a

18   motion for judgment on the pleadings, taking into account the

19   release.  But it's not a 12(b)(6) motion.  I don't believe I

20   can consider the release on a motion to dismiss.

21             I also know you say that the release is integral

22   because you produced documents in connection with the release,

23   so they can't rely on those documents.  But that still doesn't

24   make the release integral to what they pleaded.  They say,

25   We're not relying on the documents that were given to us in

E3HCASSC

1    connection with the release.  You say, Yes, you are.  When you

2    get through at the end of the day you can hardly say that even

3    if you considered the release, which I don't think I can, that

4    there are no issues of fact, and this could be decided as a

5    matter of law.

6          MR. HAIL:  Your Honor, I think, first of all, that the

7    release is integral to the complaint and I think they

8    reference -- there is two ways that it is.  First, they

9    reference the dialogue and e-mail exchange of information

10   between the parties.

11         THE COURT:  Do you really think that they are relying

12   on the release as an element of their claim?

13         MR. HAIL:  No.

14         THE COURT:  Usually the way in which it comes up is a

15   party can't claim breach of contract and not include the

16   contract as part of their complaint, because there is another

17   provision of the contract that will blow their claim out the

18   window.

19         That's not this way at all.  The release is very much

20   a defense to the claims that they make in the complaint.  It's

21   hardly integral to the claims that they make in the complaint.

22         MR. HAIL:  I think there is two answers to that

23   question.  The first is the sequence of exchange of information

24   they talk about references various e-mail communications.  As

25   we put in the Hail declaration, Exhibit A, the e-mail exchange

E3HCASSC

1   includes the very release and information that we're talking

2   about, the diligence materials.  It's as if they asked us

3   question saying, Gee, are there any bad loans in the deal?

4   Then they make allegations and then we answer it say, no or yes

5   or whatever that would be.  It's as if they only played half

6   that conversation.

7        I think when they reference the communications between

8   the parties, the exchange of information between the parties,

9   they have alleged and included that.  Specifically, paragraphs

10  49 and 50 talk about the e-mail exchange and reference the

11  e-mail exchange.  I disagree.  I think they very artfully and

12  disregarded the release.  We included it in our first round of

13  motion papers in our motion to dismiss.  They plainly knew it

14  was there.  They are plainly aware of it and have plainly

15  avoided it.

16        THE COURT:  The issue is not whether they knew about

17  the release.  Of course, they know about the release.  The

18  issue is whether the release is integral to the claim that they

19  have pleaded so that they have attempted artfully to plead

20  around the release.  Putting aside that the release is not

21  pleaded and it's not attached and it's not referred to in the

22  complaint, they say, We are not relying upon the release, and I

23  believe that they say the documents that we were given in order

24  for which we gave the release are plainly not the documents

25  we're relying on for our claims in this case.  That's what they

1    say.

2             Admittedly, in thinking about it, there are lots of

3    questions of fact that may come up, which may limit the claims

4    and may limit the damages and may cast doubt on the credibility

5    of their claims of scienter when you compare what they got for

6    which they are making a claim on, and what they got in exchange

7    for a release, because you didn't want to give up this

8    information without a release.  So they got that information

9    pursuant to the release.  So now you have to look at the

10   information they got in response to the release, and compare it

11   to the other information, and ask can they reasonably have

12   relied upon the information that they got before and the

13   information in the prospectus supplement, and not include this

14   information that they got in return for the release.  Or don't

15   they at least have to reduce their claims or modify their

16   claims in order to exclude that information and didn't that

17   information put them on sufficient notice so that reliance on

18   the other information is no longer reasonable?

19            Putting aside the fact that the release is not

20   pleaded, is not integral to their claims, could I decide those

21   issues on a motion to dismiss?

22            MR. HAIL:  You don't have to decide those issues on

23   the motion to dismiss.  The release is not a release of claims

24   that relate to misstatements or what is said in the information

25   itself.  The release is much broader than that.  The release

E3HCASSC

1   says, Any claim expense, cost, etc., relating in any way to or

2   arising out of.

3           THE COURT:  Yes.  The interpretation, we're several

4   pleadings down the road, but the interpretation of the release

5   and what it covers also raises issues of fact.  It doesn't in

6   your mind, I realize that.  But step back just for a moment.

7   RBS doesn't want to give information that it has not completely

8   betted and doesn't want someone else to be relying on it.  You

9   say, Look, before I give this information we want a release.

10  So you can look at this information, we will give it to you,

11  but we don't want to be sued on the basis of this information.

12  Then they say, Okay, we will give you this release.

13          Now you say this release was really a

14  get-out-of-litigation-free card.  In order to get this

15  information, you won't sue us at all based on anything to do

16  with this transaction.  In order to get this due diligence

17  information, you won't sue us at all, on anything, not only

18  arising out of or relating to the information we're giving you,

19  but you have, in effect, overnight, in order to get this

20  information, given us a free pass for this entire transaction.

21  One would question, is that the real meaning of the release?

22  Are there any issues of fact with respect to how this release

23  should be interpreted?  You say no, right?  This release was

24  "we cant be sued at all for this transaction."

25          MR. HAIL:  I think what the release says is that the

E3HCASSC

1   release -- they can't sue us claiming they didn't know the

2   contents of the loans and the loans files.  Any case, any claim

3   that involves the diligence, the accuracy of the diligence, the

4   presence of diligence, what the diligence revealed, the subject

5   matter.

6           THE COURT:  What could they sue you on in connection

7   with the transaction?

8           MR. HAIL:  They could sue us on perhaps if we didn't

9   have title to the loans.  I don't know.

10          THE COURT:  Why wouldn't that relate to the

11   information?

12          MR. HAIL:  It wouldn't implicate the diligence.

13          THE COURT:  Why not?

14          MR. HAIL:  In this case one of the allegations,

15   scienter, was the fact we had the Clayton reports, the Clayton

16   trending reports, all of these other diligence reports.

17          THE COURT:  Why would it be anything to do with the

18   collectability of the loans?

19          MR. HAIL:  Not the collectability.  I think about the

20   underwriting and compliance with standards, the information

21   provided, if you can track that back to what's in the

22   diligence.

23          THE COURT:  Isn't part of the underwriting for the

24   loans a determination of whether the documentation of the loans

25   is sufficient to pass title?

E3HCASSC

1              MR. HAIL:  I'm talking about a different.  I'm not

2      talking about whether or not the loan itself was properly

3      underwritten such that there was an existing security interest.

4      That could be a defect uncovered in the diligence.  I'm talking

5      about the paper flow from originator to sponsor to third party

6      into the trust.  If something is wrong with that chain, for

7      example, there have been claims brought like that, that the

8      diligence itself wouldn't effect that kind of claim.  But if

9      you're arguing in this case that, I didn't know about

10     underwriting defects, I didn't know the level of underwriting

11     defects, in order to get the diligence, you agree to release

12     the claims and arguments that I didn't know, that I got

13     defrauded, that I didn't know about the compliance.  I think

14     that's squarely on point.  I think that's exactly what their

15     scienter, when they talk about Clayton reports, attempts to

16     impute to us.  They argue all the other diligence reports are

17     evidence we should have known of something, but not the

18     specific diligence reports in this case.

19             THE COURT:  I know.  They say they are not relying on

20     that specific report for their allegations.

21             MR. HAIL:  But they attempt to create the fact that

22     there is scienter from all of these other reports that are

23     significant, that somehow are another RBS did know something

24     other than the specific one that relates to this specific deal.

25     Other Clayton reports have been specifically rejected as

E3HCASSC

1    evidence of scienter as they relate specifically to RBS, and

2    the Stichting Pension Funds case.  Those other Clayton reports

3    are not evidence of scienter, but that's where they catch

4    themselves.  If the diligence reports in this case and the

5    diligence, what it reveals, the method it communicates

6    allegedly imputes scienter to RBS, this claim necessarily

7    involves the diligence and relates to the diligence.  You don't

8    have to come up with some outlandish construction of whether or

9    not there is a chain of title dispute that relates to the

10   diligence materials.  It is squarely going to be a defense.  It

11   is squarely at issue.  Squarely part of the materials they

12   requested.  They wanted to do the deal.  They just blindly

13   ignore it.  That's how this specific claim is released.  That's

14   why this specific claim is covered by this release.  Exactly

15   what was intended at the time.

16          THE COURT:  Why I suggested to you before the release

17   may be relevant to a defense in the case, and it may limit

18   their damages and it may constrain their ability to make

19   various arguments in the case, first of all, those raise issues

20   of fact.  Secondly, they don't establish why the release, which

21   is not pleaded and is not incorporated by reference into the

22   complaint, can be considered on a motion to dismiss.

23          MR. HAIL:  I think the law is that if they have

24   knowledge of it and they plead around it, that we shouldn't

25   have to be put through all the other necessities.

E3HCASSC

1          THE COURT:  The law in the Second Circuit is clear

2    after *Chambers* I think, that it's not enough that the plaintiff

3    was aware of the document, had access to the document, had the

4    document, but the plaintiff had to "rely on it," for purposes

5    of bringing the case.

6          MR. HAIL:  In this case, I think they relied on it to

7    avoid talking about it.  It is clear that they didn't mention

8    the diligence.  If the diligence materials had shown no defects

9    and there was no release, I'm a hundred percent confident that

10   we would have heard in the complaint that there was a diligence

11   report provided to us which showed no problem at all.

12         THE COURT:  So they can't rely on that due diligence

13   report that was given to them, in return for their giving the

14   release.  So they don't.  You say, Well, what's left is

15   insufficient for purposes of reliance and scienter.  Second, we

16   will win because what we gave them put them on sufficient

17   notice, and we got a release for that.  But that's a defense.

18   It's surely not part of their claim.

19         MR. HAIL:  Your Honor, I think there is a couple

20   points in there.  I say, obviously, you are right, but other

21   than the last part.

22         THE COURT:  Thank you for that one.

23         MR. HAIL:  The fact we share the diligence is lack of

24   the scienter, evidence of the reasonable reliance.  We think

25   absent those allegations, the case falls away period.  Putting

E3HCASSC

1   aside whether the diligence was shared with or without a

2   release, we think the complaint didn't survive.  If you look at

3   the case law that up upholds and allow these cases to consider,

4   they are almost universal, the diligence is not shared.  The

5   results of those diligence shows defects if the loan pool that

6   was withheld from the third party, be it the no purchases or

7   monoline.

8           You are correct that whether or not there was a

9   release in this case, the sharing of the diligence is a

10  significant difference in the matter.  But secondly, the

11  release is not limited to, We won't rely on the contents of the

12  diligence and sue me on the contents of the diligence.  The

13  release is actually drafted much broader, and it's entirely

14  within the Court's purview to look at whether this claim

15  relates in any way to the diligence materials.  Is it going to

16  be a defense?  Is it going to be an element of what they relied

17  upon one way or the other.  If the answer to that question is

18  yes, and you can decide that now, this case -- the claim ought

19  to be dismissed.  You don't have to worry about what else the

20  release might do.  You don't have to worry about what they

21  contend they didn't rely upon or what the diligence showed.

22  The fact that you are asking yourself the question is the

23  diligence going to be considered in that quantum of

24  information, I think in their reply brief that specifically

25  point through a series of fact issues they think that it

E3HCASSC

```
1   raises.  What the did the diligence show?  How did we use it?
2   They say those are fact issues which you can't decide now.  In
3   reality, the fact that you have to ask those questions means
4   the release is implicated.  The language in the 1344(b), 28
5   U.S.C. 1344 (b), which is bankruptcy court jurisdiction speaks
6   to cases arising in or relating to bankruptcy.  We all know the
7   construction of relating to jurisdiction and bankruptcy is
8   extraordinarily broad.
9             THE COURT:  Please.
10            MR. HAIL:  Justice Alito went through the same
11   analysis in looking at what a forum selection clause should be.
12            THE COURT:  You are very far down the line to
13   attempting to construe the meaning of the release and far away
14   from whether the release was pleaded, incorporated by reference
15   or integral to the complaint.
16            MR. HAIL:  I think that it is integral.  We have had
17   this dialogue.  The reason it's integral is because the sharing
18   of information and what that information means necessarily
19   includes the diligence material.  They have just stopped the
20   conversation mid-sentence.  And then they go on to talk about
21   diligence materials, but not these diligence materials.  The
22   fact that they ignore it is obviously article pleading around
23   it, and their whole theory has to encompass this exchange of
24   information with RBS.  That's the reason it's integral.  That's
25   the reason it was relied upon.  They plainly knew about it.
```

E3HCASSC

1    They did want to talk about it.  They didn't want to have this

2    dialogue at this time.  They wanted to artfully avoid it.

3              THE COURT:  I have your point.

4              MR. HAIL:  Moving on to the specific misstatements, we

5    have said in the past that the release takes out all the

6    claims.

7              THE COURT:  I should have asked you for an estimate of

8    time at the beginning.  Second Circuit would give 12 minutes.

9    We're now at about half an hour, 40 minutes.

10             MR. HAIL:  I will make two quick points, your Honor.

11             The term sheet itself says it's superseded if you get

12   a prosup.  The term sheet is an incomplete document.  It has

13   gaps in it.  Specifically, the deal changes, the amounts

14   change, it is plainly a draft document.  The tranches change,

15   the amounts change.  So any reliance upon the material in the

16   term sheet is by its terms superseded by the prosup and also it

17   in and of itself not accurate because it is specifically a

18   draft document.  It is a term sheet.  It is not the deal.

19             The prosup then contains the very clear attributions

20   of language to WMC.  There is no allegation in the case that we

21   mailed to report or mistakenly or knowingly misstated what WMC

22   told us about the loans.  That allegation is simply isn't

23   there.

24             Those are the two things I will like to point out.

25             THE COURT:  Thank you.

E3HCASSC

1          MR. MAHER:  Your Honor, good afternoon.  Bill Maher on

2     behalf of plaintiff, Assured Guarantee.

3          It's obvious from your Honor's comments that you are

4     very familiar with the facts of this case.  I'm going to try to

5     skim over them as quickly as I can.  I think there are some

6     that I need to call to your attention.

7          Obviously, this transaction has been a complete

8     disaster, horrific losses, horrific performance by an RMBS that

9     was structured by RBS known as Soundview.  It's a 1.1 billion

10    securitization.  Losses as of June 25 last year are

11    434,000,000, 39 percent of the aggregate balance of the loans

12    and of the remaining amount, 61 percent are 60 days or more

13    delinquent.  That's paragraphs 12 and 70 of our complaint, your

14    Honor.

15         With respect to the group two loans which we have

16    wrapped, those are equally bad in terms of losses.  About 39

17    percent, $157,000,000 out of 362 that was the collateral pool,

18    and their performance thereafter has been even a little worse

19    than a aggregate.  That's in paragraph 71.  Assured projects

20    more than a hundred million dollar loss with respect to this

21    insurance policy.  That's paragraphs eight and 14.

22         As you noted, they approached us for an insurance wrap

23    with respect to the class two certificates.  They advised us

24    the transaction was going to close in about two or three weeks.

25    As you noted they gave us two documents initially.  They gave

24

E3HCASSC

1    us on March 1, 2007, the loan tape.  That contains loan-by-loan

2    information, a lot of detail that I have heard you discuss.

3    That's paragraphs 45 and 46.  On March 7 they gave us a loan

4    tape again and gave us the term sheet.  As you noted, neither

5    of those documents contain any disclaimers with respect to this

6    information was provided to anybody other than RBS.  In fact,

7    their fingerprints are all over it, we allege the metadata in

8    the documents, the logos are all RBS-related information.

9            The terms sheet described the structure and extensive

10   information concerning the mortgage loans in the face of its

11   states it's an RBS document.

12           The mortgage loan information set forth in the loan

13   tape and summarized in the term sheet is set forth in paragraph

14   53 of our complaint, your Honor, talks about the debt-to-income

15   ratio, loan-to-value ratio, combined loan to value and other

16   information.

17           Now, I would like to address just briefly the Hail

18   declaration.  I understand your Honor is not inclined to

19   consider the release in some of those documents.  I want to

20   point out why it's significant.

21           Exhibit A to the Hail declaration attaches not just

22   what was referenced in the complaint meaning the e-mails up

23   until March 7 when the documents were transmitted to also, it

24   also attaches e-mails thereafter from March 8 to March 12.

25   Those are nowhere referenced in the complaint, your Honor.

E3HCASSC

They are completely deorder the complaint, and they added it as

a factual matter that is not part of our case.  They also

attach as Exhibit D a release dated March 9, which is not

referred to in the complaint.  I refer to them because they are

timeline in terms of the dates of what happened here, but I do

not intend to address them as part of my factual presentation

because they are not part of our case.

            THE COURT:  Let's pause just for a moment.

            The point I was making with Mr. Hail is, yes, by

avoiding addressing the release, you may survive under the

rules a motion to dismiss, because you don't plead the release.

It's not relied upon for purposes of the complaint, but then

the question becomes is it really a viable case or is it a case

brought solely to get over a motion to dismiss.

            You have a lot more material with the release.  You

gave a release in order to be able to get that material.  Then

the question becomes how reasonable, plausible is it that given

all of the materials that you receive with the release, which

you agreed you wouldn't sue on, how reasonable, plausible, is

it that you could have relied upon what was left, and how

reasonable or reliable is it that the RBS people were

attempting to defraud you or reckless in what they were doing

if they were prepared to give you the materials that they gave

you with the release.

            Is this an artfully pleaded case in order to get

E3HCASSC

beyond the motion to dismiss?  These things would have to be

considered on a motion for summary judgment.  Is it really a

case that's brought for purposes of eventually obtaining a

relief on the merits before a jury at the end of the case?  Or

for some other reason?

          MR. MAHER:  Your Honor, the case was brought because

there were horrific losses.

          THE COURT:  Yes, I know.  Both sides should give me a

modicum of credit.  Of course, it's brought because there were

enormous losses.  The question becomes whether those enormous

losses are compensable because of what the defendants did.  Are

they compensable under the standards set out by the law?  Or is

this a case in which the plaintiffs say, We suffered enormous

losses, therefore, you must pay?

          MR. MAHER:  No, your Honor, that's not this case.

          I will tell you, and you've hinted at some of them in

terms of the fact issues that are going to have to be unpacked

with respect to what the implications of this are, I will tell

you and I think this is complete dishonest, but it's one thing

that they have said.  They say in their brief and in their

reply brief we received the Clayton report on Soundview, the

initial pages on six and seven and reply brief on page two.

There is no support whatsoever for that assertion, either as a

matter of pleading or as a matter of fact.  We never got a

Clayton due diligence report.

E3HCASSC

1           THE COURT:  On Soundview.

2           MR. MAHER:  Exactly.

3           If you go outside the record, your Honor, and click on

4     the icons, it is not a Clayton due diligence report.  I'm not

5     saying we should do that.  It's completely improper.

6           THE COURT:  Trust me, I don't go beyond the papers

7     that are submitted to me.

8           MR. MAHER:  What I'm saying, your Honor, is the

9     representation they have made to try to get you to move five

10    steps ahead in this case are not accurate.  The reality of the

11    situation will ultimately be presented to your Honor in terms

12    of what happened here and what we believe to be are compensable

13    losses that we think we were defrauded into wrapping this

14    structure.

15          Yes, the release is not part of their case.  It is

16    their affirmative defense under 8(c)(1) under the Federal Rules

17    of Civil Procedure.  We have not pled it.  *Chambers*, as you

18    indicated, you Honor, is clear law in the Second Circuit saying

19    that's not part of our case.

20          THE COURT:  What were you given then along with

21    release in terms of due diligence materials?

22          MR. MAHER:  We were given some materials, your Honor.

23    I would rather not go into the factual deorder the record

24    issues because it gets us into an issue we don't need to go to

25    today and I believe will ultimately vindicate us in terms of

E3HCASSC

1    that we were defrauded into entering into this transaction.

2           THE COURT:  All right.  You couldn't reply on any of

3    those materials that you were given, along with the release, as

4    a basis for your claim because you gave a release with respect

5    to those materials.

6           MR. MAHER:  Your Honor, I don't want to debate that,

7    to be honest with you, because the release is not properly

8    before the Court.

9           THE COURT:  Okay.

10          MR. MAHER:  With respect to the prospectus supplement,

11   your Honor, I can this is important, moving forward in the

12   chronology on March 13, 2007, RBS provided Assured with the

13   draft prospectus supplement dated March 9, which cover page

14   bore the names of all three defendants.  That's in Paragraph 55

15   of our complaint.  The draft prospectus described the quality

16   and characteristic of the mortgage loans and underwriting

17   practices guidelines used in originating the loans.  It says

18   that the mortgage loans were originated in accordance with

19   prudent underwriting practices and that information that was

20   critical was verified and checked.  It says that 99 percent of

21   the borrowers in the pool had DTI less than 60 percent and

22   89.5 percent of the borrowers had DTI of 50 percent or less.

23   The same statements appear verbatim in the final prospectus

24   supplement, which RBS provided to Assured on March 20, the day

25   before Assured agreed to issue its insurance policy on

E3HCASSC

1    March 21, 2007.  That's paragraphs 55 and 68.

2             Your Honor, if I might, I would ask you to turn to the

3    prospectus supplement.

4             THE COURT:  I have tracked it through.  I understand

5    that there are qualifications, but the qualifications don't

6    explicitly qualify the language that you are looking at.

7             MR. MAHER:  It's more than that.  I would like to

8    point it out to you.  It's page S29, which is their first, what

9    they call get-out-of-jail-free card.  With respect to the

10   mortgage pool, they rely on the first sentence under Mortgage

11   Pool, "The information set forth in the following paragraphs is

12   based on searching records and representations about the

13   mortgage loans that were made by the originator at the time it

14   sold the mortgage loans."  That's page S29, your Honor, Exhibit

15   C to the Hail declaration.

16            THE COURT:  I have it.

17            MR. MAHER:  Based on, your Honor, does not suggest

18   exclusively based on without verification and will not be

19   checked or verified by RBS.  In fact, if you look down in the

20   next paragraph, your Honor, the very next paragraph, the middle

21   of that paragraph, it's about halfway down, it starts, "The

22   depositor believes that the information set forth in this

23   prospectus supplement with respect to the mortgage loans will

24   be representative of the characteristics of the mortgage pool

25   as it will be constituted at the time the certificates are

E3HCASSC

1    issues.  Although the range of mortgage rates and assurities

2    and other characteristics of the mortgage loans may vary, any

3    statistic presented on a weighted average basis or any

4    statistic based on the mortgage loans is subject to a variance

5    of plus or minus five percent."  It goes on.  "If any material

6    pool characteristic of the mortgage loans on the closing date

7    differs by more than five percent, or more from the description

8    of the mortgage loans in this prospectus supplement, the

9    depositor will file an updated pool characteristics by form 8K

10   within four days following the closing date."

11          Your Honor, this language clearly states and suggests

12   that RBS is actively monitoring the mortgage pool for

13   compliance with the characteristics contained in the prospectus

14   supplement.

15          Turning your Honor, if we could, to their next issue

16   that they quote just part of the language from this prospectus

17   supplement, if you turn to page S85, there's again, if you look

18   there is a caption, the Originator as that heading.

19          THE COURT:  I know.

20          MR. MAHER:  Then it says General.  The information set

21   forth in this section.

22          THE COURT:  I know.

23          MR. MAHER:  Has been provided by WMC Mortgage.

24          THE COURT:  It arguably refers to the section entitled

25   General and not to the next section, which is Underwriting.

E3HCASSC

1          MR. MAHER:  Exactly, your Honor.

2          There is no qualification about the underwriting

3     standards.  If you look for comparison, your Honor, on page

4     S98, it says Servicer, it doesn't have that sentence under one

5     of the subheadings.  It's the first sentence right under the

6     Servicer.  "The information in the following paragraphs has

7     been provided by Countrywide Home Loan Servicing."  Then it

8     goes after and talks about the paragraphs.

9          Your Honor, we're entitled to a motion to dismiss, we

10    are entitled to an inference that that sentence should have

11    been up above General if it was intended at all to apply to all

12    the preceding paragraphs.

13         Assured reasonably relied upon the modeling -- used in

14    its modeling analysis upon the information provided by RBS,

15    Paragraph 56 of our complaint.  Our complaint talks bout the

16    cash flow model, the expected loss model, specifically and

17    significantly, your Honor, we had no interaction with the

18    originator of the loans, WMC Mortgage.  That's alleged in

19    paragraph seven.

20         In addition as RBS knew, Assured had no access to and

21    no ability to access the underlying loan files and had to rely

22    upon RBS information.  That's paragraph 735 and 61.

23         Assured alleges that it would not issued the insurance

24    policy without the representations made by RBS in and by

25    tendering the loan tape, the terms sheet and the prospectus

1    supplement.  That's paragraph 67.

2            Following the shocking performance of the Soundview

3    transaction, Assured commenced an investigation.  That's

4    paragraph 72 of the complaint, your Honor.  Although we had no

5    right to obtain the underlying files, the certificate holder

6    for the class 2 certificates did and in March 2010 authorized

7    us to obtain and review those.  Our forensic review took 14

8    people working for three months.  It confirmed WMC had utterly

9    failed to adhere to its underwriting guidelines in originating

10   the mortgage loans; and two, materially important

11   characteristics of the mortgage loans did not conform to the

12   information provided by RBS in the loan tape, the term sheet

13   and the prospectus supplement.  Assured reviewed virtually all

14   of the loan files, 1,588 of the 1,593 loans of the group two

15   mortgages.  Of those loans more than 1,444, 91 percent of them,

16   materially violated one or more of RBS's representations to

17   Assured.  That's paragraphs 11 and 73.

18           The misrepresentations were pervasive, but included

19   excessive DTI, excessive LTV, unreasonable stated income,

20   failure to verify that borrowers assets were sufficient,

21   insufficient borrower reserves, failure to verify employment,

22   failure to investigate credit history.  That's paragraph 76.

23           The misrepresentations are detailed in paragraph 72 to

24   82 of the complaint, your Honor.  And had Assured known of

25   these misrepresentations they never would have issued the

E3HCASSC

1    policy.  That's alleged in Paragraph 82.

2              I would like to turn, if I could, to the scienter

3    issue, and their knowledge of the falsity.

4              As your Honor indicated, we have alleged many

5    different ways in which RBS had knowledge, let alone scienter,

6    that these mortgages were -- the information they provided us

7    was materially inaccurate.  First, the pervasive nature of the

8    breaches as verified by a forensic review of virtually every

9    loan file revealed a 91 percent breach.  We've particularized

10   that specific allegation, your Honor, with a former senior vice

11   president of RBS of asset-back financed, we refer to them as

12   confidential witness 22, who was copied on e-mails in this case

13   and described Soundview as, "one of the worst" and "really a

14   piece of garbage."  That's paragraph 100 of the complaint.

15             Second, RBS had a practice of placing loans into

16   securitizations that it knew were defective and not in

17   compliance.  Again, we particularized that with the Clayton

18   testimony before Congress and the Clayton reports that were

19   submitted in connection with that testimony, Paragraphs 87 to

20   91, in which Clayton representatives testified RBS regularly

21   would resubmit noncompliant loans into the portfolio for

22   securitization.  That were EV1 loans which were loans that were

23   complied with the guidelines.  There were EV2 loans which are

24   loans that didn't comply with the guidelines, but had

25   exceptions that were acceptable.  There were EV3 loans which

E3HCASSC

 1    didn't comply with the guidelines and had no compensating

 2    factors.  The EV3 loans alone, RBS would put back more than

 3    half of those loans into the securitization pool.  So RBS knew

 4    it was doing this during the relevant period.  Again, the

 5    testimony of Clayton executive relates to 2006 and the first

 6    part of 2007, which is exactly the period for the

 7    securitization at issue in this case.

 8            THE COURT:  By the way, are you familiar with Judge

 9    Torres's decision.

10            MR. MAHER:  I am not.  I was not given notice it was

11    going to be raised today.

12            THE COURT:  That's fine.

13            MR. MAHER:  Third, your Honor, we have alleged that

14    RBS made efforts to intimidate and fire loan appraisers and

15    reviewers who rejected too many loans.  We particularized that,

16    your Honor, with a former Clayton employee who we identify as

17    confidential witness 11.

18            THE COURT:  I'm familiar with the allegations, I

19    really am.

20            How much more time do you need?

21            MR. MAHER:  15 minutes, your Honor.

22            THE COURT:  No.

23            MR. MAHER:  I will quickly move forward then.  I

24    understand.

25            Let me just get the categories out, your Honor.

E3HCASSC

1          THE COURT:  I'm really familiar with the facts and the

2     law on the motion, and Second Circuit would give 12 minutes.

3     Regularly ten.  So far we've gone on about a half an hour.

4          MR. MAHER:  I think I have only been up about 15

5     minutes, your Honor.

6          THE COURT:  Maybe you are right.  Maybe your colleague

7     used up more time than I thought.

8          MR. MAHER:  I want to be responsive to the Court's

9     concerns or issues.  If there are any issues I can address for

10     you, I would be happy to do that.

11          THE COURT:  I do not see how your claim for a

12     violation of the insurance laws survives the appellate division

13     decision in *MBIA*.

14          MR. MAHER:  Very well, your Honor.

15          As we read the decision, and I understand from what

16     you're saying, your Honor, you don't read the decision that

17     way, the first department held that we could have a damages

18     remedy -- compensatory damages remedy under 3105.  You can't

19     get rescission.

20          THE COURT:  You cannot get rescission and you cannot

21     get, they say, rescissory damages.

22          MR. MAHER:  Yes.

23          THE COURT:  They explain why that's true.  You can't

24     avoid the import of the decision by seeking the same damages

25     and relabeling them under another name.

E3HCASSC

1          MR. MAHER:  I think that's what the Court did, your

2     Honor.  I think that's exactly what the first department did.

3          This is an insurance context.  An insurer issuing a

4     policy based upon a false statement, you don't need scienter.

5     You don't need knowledge of the falsity, even an innocent

6     representation is sufficient to avoid the policy under 3105 or

7     qualifies under 3105.

8          THE COURT:  At the end of the day, after the appellate

9     division decision in *MBIA*, the claim for damages, period, under

10     the insurance law, was rejected by the appellate division.

11          MR. MAHER:  The rescissory damages was rejected, your

12     Honor.  That was the only damage alleged in that case.

13     However, your Honor, to me, the language is very clear.

14     Obviously, you disagree with that.  The *MBIA* court says

15     although the insurance law provides for avoiding an insurance

16     policy or rescission, it also mentions defeating recovery

17     thereunder, which logically means something other than

18     rescission.  Then they go on to say neither defendants, nor the

19     federal cases on which they rely, explain why defeating

20     recovery thereunder cannot refer to the recovery of payments

21     made pursuant to an insurance policy without resort to

22     rescission.  That's what we're seeking.

23          THE COURT:  Then they refer to that as rescissory

24     damages.  They explain why those are not recoverable.

25          MR. MAHER:  That's not how I read the case.  I

E3HCASSC

1    understand that's how you read the case.  I respectfully

2    disagree with that.  They were talking about rescissory damages

3    because that's all that were alleged.  But they are saying you

4    can get damages, other than rescission, because you can't get

5    rescission, you can't get rescissory damages, but you can get

6    other damages, that's what the first department is saying here.

7    This, from our perspective in terms of people who do this side

8    of a work is a path-breaking decision that is a positive for

9    the monoline financial guaranty insurance companies.

10            THE COURT:  There is no other case that reads it that

11   way.

12            MR. MAHER:  There is no other case.  This case was

13   just decided, your Honor, in April of last year.  There has

14   been no subsequent New York case that has, as I understand it,

15   gone forward to explain further the debate that you and I are

16   having, which is are you right -- and of course, you are the

17   judge -- that what the first department is saying is that you

18   are out of luck, you have no damages at all; or what I'm

19   saying, which is you can't get rescission because you are

20   monoline financial guarantee company who swore off rescission

21   and you cant get rescissory damages; however, the statute says

22   defeating recovery means you can get damages for violation of

23   the statute.

24            THE COURT:  Okay.

25            MR. MAHER:  Your Honor, we're not seeking to rescind

E3HCASSC

1    the policy.  We are seeking damages.

2            THE COURT:  I know that.  Your complaint makes it

3    clear you are not seeking rescission.  The briefs refer to the

4    fact that you are legally unable to seek rescission under the

5    terms of your insurance contract, right?

6            MR. MAHER:  Yes.

7            THE COURT:  In addition, the appellate division

8    describes that as inability to seek rescission.  They also

9    describe it as this is not a case where rescission would be

10   impracticability.  They disagree with the lower court.  It's

11   not a question of impracticability.  It's a question of legal

12   impossibility.

13           MR. MAHER:  Your Honor, again, in terms of reading how

14   this decision is written, admittedly it's not a fulsome as it

15   might be, and we wouldn't have to have this debate.

16           THE COURT:  Your interpretation would be completely

17   different anyway, because your suggestion is they are leaving

18   open a possibility of damages that were never even sought in

19   the case.

20           MR. MAHER:  No.  What I'm saying is they are

21   construing the statute in a way in which they are saying that a

22   remedy is available under the statute.  They did that in the

23   course of deciding the case in front of them.

24           Judge, if we look at how this is drafted, the part I

25   read says that you can get some other relief.  Then they go on

E3HCASSC

1    and say the court erred, however, different than this.  This is

2    a positive, the Court erred, however, in granting summary

3    judgment on the issue of recessionary damages.  That is a

4    separate point they are talking about, as opposed to one I'm

5    talking about.

6            I understand and I respect that you may have a

7    different view of this.  I am conveying to you and I know this

8    from talking to many people in the industry, your construction

9    of this -- if that's in fact what you ultimately rule, your

10   Honor -- will be a shock and a surprise to everybody in the

11   industry who believes that this is a positive for the

12   monolines.

13           THE COURT:  If I don't dismiss case it will be a shock

14   and surprise to your colleague on the other side, telling me

15   that there has never been another case that's quite similar to

16   this that has not been dismissed out of the box.

17           MR. MAHER:  Very well, your Honor.

18           I'm happy to address whatever questions you have.

19           THE COURT:  Which way would you like to be shocked?

20           MR. MAHER:  I would like to be sustained in terms of a

21   moving forward with the case, your Honor.  I'm not sure I want

22   to be shocked.

23           THE COURT:  Okay.

24           MR. MAHER:  Can I address any other issues for you?

25           THE COURT:  No.  I think that's fine.  Thank you.

E3HCASSC

1          MR. MAHER:  Very well.  Thank you, your Honor.

2          THE COURT:  Anything further, Mr. Hail?

3          MR. HAIL:  No, your Honor.  I could, but nothing

4     something clarification.

5          THE COURT:  On the insurance law issue?

6          MR. HAIL:  Should I approach?

7          THE COURT:  Sure.

8          MR. HAIL:  On the insurance law issue your Honor gets

9     it exactly right, the *MBIA* case, I'm intimately familiar with.

10    My firm was on that case, and I think it is right.

11          As to what the monoline insurance, how that interpret

12    that as a great victory I'm surprised giving the lack of the

13    remedy.  In fact, I think Mr. Maher said there has been no

14    other cases that have interpreted it.  In fact, in our reply

15    brief we cite two specific cases that had come out similarly.

16    That's in footnote 36 in the reply.  Specifically, if you take

17    a look at *CIFG v. Bank of America*, 2013 WL 5380385, New York

18    County September 23, 2013, *Home Equity Mortgage Trust v. DLJ*,

19    2013 W L5314331, both of which fine no remedy.

20          In similar context, this is a case where they made an

21    irrevocable policy.  There is no dispute.  We put that in.

22    They have waived their ability to rescind, therefore, their

23    damaged area is gone.

24          As to Mr. Maher's idea that they just said you can't

25    call it rescissory damages, they meant to allow a claim for

E3HCASSC

1     compensatory damages, that's not what the case says.  That's

2     not what the insurance code says.  That would be a-path

3     breaking interpretation of the law out there.  That's the point

4     I would like to make on that.

5              THE COURT:  Thank you.

6              I'm prepared to decide.

7              This case arises out of certain residential

8     mortgage-backed securities, RMBS, transactions in or around

9     March 2007.  The plaintiff, Assured Guaranty Municipal Corp.

10    (Assured), a monoline insurance company, brings this action

11    against the defendants RBS Securities, Inc., (RBS Securities)

12    RBS Financial Products, Inc. (RBS Financial), and Financial

13    Assets Securities, Corp. (FAS), collectively RBS.

14             The plaintiff alleges that in connection with RMBS

15    sales, the defendants obtained an insurance policy from the

16    plaintiff by fraudulent misrepresentations.  The plaintiff

17    asserts claims for fraud, aiding and abetting fraud and

18    violation of the New York insurance law.  This Court has

19    subject-matter jurisdiction under 28 U.S.C. Section 1331, based

20    on the complete diversity of citizenship between the plaintiff

21    and the defendants and on the requisite amount in controversy.

22             The defendants now move to dismiss the amount amended

23    complaint in its entirely pursuant to Federal Rules of Civil

24    Procedure 12(b)(6).

25             In deciding a motion to dismiss, pursuant to Rule

E3HCASSC

1    12(b)(6), the allegations in the complaint are accepted as true

2    and all reasonable inferences must be drawn in the plaintiff's

3    favor.  *McCarthy v. Dun & Bradstreet Corp. 482 F.3d 184, 191*

4    *(2d Cir. 2007); Arista Records LLC v. Lime Group, LLC, 532 F.*

5    *Supp. 2D 556, 566 (S.D.N.Y. 2007)*.

6             The Court's function on a motion to dismiss is not to

7    weigh the evidence that might be presented at trial, but merely

8    to determine whether the complaint itself is legally

9    sufficient, *Goldman v. Belden 754 F.2d 1059, 1067 (2d Cir.*

10   *1985)*.  The Court does not should dismiss a complaint if the

11   plaintiff has stated enough facts as state a claim to relief

12   that is plausible on its face.  *Bell Atlantic Corp. v. Twombly,*

13   *550 U.S. 554, 570 (2007)*.  A claim has facial plausibility when

14   the plaintiff believes factual content that allows the Court to

15   draw the reasonable inference that the defendant is libel for

16   the misconduct alleged.  *Ashcroft v. Iqbal, 556 U.S. 662, 678*

17   *(2009)*.  While the Court should construe the factual

18   allegations in the light more favorable to the plaintiff, the

19   tenet that a court must accept as true all of the allegations

20   contained in a complaint is inapplicable to legal conclusions.

21   Id.

22             When presented with a motion to dismiss pursuant to

23   Rule 12(b)(6), the Court may consider documents that are

24   referenced in the complaint, documents that the plaintiff

25   relied on in bringing suit and that are either in the

E3HCASSC

plaintiff's possession or that the plaintiff knew of when

bringing suit or matters of which judicial notice may be taken.

*See Chambers v. Time Warner, Inc. 282 F.3d 147, 152 (2d Cir.*

*2002).*

          The Court accepts the plaintiff's allegations in the

amended complaint as true for the purposes of this motion to

dismiss.  Around March 2007, RBS securitized a pool of over

4,900 residential mortgage loans, (the "mortgage loans") in a

transaction known as the Soundview Home Loan Trust 2007-WMC1,

(the "Soundview transaction").  RBS Financial purchased all the

mortgage loans from their originator, WMC Mortgage Corp, (WMC),

then conveyed the loans to FAS, the depositor for the Soundview

transaction.  FAS conveyed the loans to the Soundview trust,

which issued various tranches of certificates representing

interest in the cash flow from the payments of the mortgage

loans.  These certificates were then marketed and sold by RBS

Securities, the underwriter, to investors.

          RBS Securities, RBS Financial and FAS are all RBS

entities.  They operated through minny common employees are

located at common office addresses with common telephone

numbers.

          To increase the marketability of the certificates to

investors, RBS approached Assured or on about March 1, 2007 to

obtain an insurance policy that would insure payments on the

mortgage loans underlying some or all of the RMBS certificates.

E3HCASSC

On March 7, 2007, upon the demand of one investor who was interested in purposing the entire 291,000,000 dollar tranch of class II-A-I certificates, (the "certificates"), but wanted to have the certificates insured, RBS asked Assured to issue financial guaranty insurance with respect to this certificates. On March 21, 2007, Assured issued financial guaranty insured policy number 60125-N, (the "policy), insuring payments on the mortgage loans underlying these certificates.

To obtain the policy, RBS provided Assured certain data and documents.  First, on March 1, 2007, RBS sent to Assured an Excel spread sheet known as the "loan tape," containing attributes of each mortgage loans, as well as information about the borrower and the mortgaged property.  On March 7, RBS also provided Assured with a term sheet describing the Soundview transaction and summarizing data in the loan tape.  The loan tape displayed a logo of RBS Securities at its top and the metadata of the Excel file also stated the file emanated from the computers of RBS securities and was last modified by an employee of one or more RBS defendants.  Amended complaint paragraph 46.

The term sheet also indicated that the information therein was presented by RBS Securities and FAS.  Amended complaint paragraph 50.

Finally, on March 13, RBS sent to Assured a draft prospectus supplement, which represented that, among other

E3HCASSC

things, WMC, the originator of the loans generally followed its

own underwriting guidelines and originating the loans by, for

example, verifying or reviewing each loan applicants' sources

of income, as well as credit and mortgage payment history.

Amended complaint paragraph 55.

In order to determine whether to issue the policy

Assured used the data from the loan tape and the term sheet to

assess risk and to project losses for the Soundview transaction

with quantitative models known as an expected loss model and a

cash flow analysis.  Assured also allegedly relied on the

representations in the prospective supplement that WMC

prudently originated the loans according to prudent

underwriting standards to insure that borrowers were able to

make payments and that mortgaged properties provided adequate

security to the loans.  Assured allegedly had no access to the

underlying loans files, amended complaint paragraph 51.

However, according to Assured allegations WMC did not,

in fact, adhere to its underwriting guidelines and originated

loans with attributes that grossly overstated the borrowers

ability to pay and understated the risks of the loan.  As a

result, the mortgage loans underlying the Soundview transaction

experienced a high level of defaults and foreclosures.  As the

insurer of the mortgage payments, Assured has paid over

$160,000 of claims under the policy and is projecting having to

pay a total of more than $100,000,000 in unreimbursed claims.

E3HCASSC

1     Amended complaint paragraph 108.

2         In addition, Assured alleges that the RBS defendants

3     knew from the very beginning that the mortgage loans

4     securitized in its RMBS were originated without regard to

5     borrowers' ability to pay or adherence to basic underwriting

6     standards.  RBS not only did not cease to buy loans from WMC,

7     but expanded its cooperation with WMC in which RBS purchased

8     and securitized more loans from WMC.  RBS also used third-party

9     due diligence firms reviewing the loans, including Clayton

10     Holdings (Clayton), which may be involved in the Soundview

11     transaction, but waived in loans that Clayton found did not

12     comply with the applicable underwriting guidelines and without

13     regard to whether the borrower could repay the loan.  Amended

14     complaint paragraph 90.

15         As a threshold matter, the defendants argue that this

16     action is barred by release signed by Assured and obtaining a

17     due diligence report prepared by Clayton on the mortgage loans.

18     The defendants assert that on March 9, 2007, Assured executed a

19     letter agreement in connection with the request and receipt of

20     a due diligence report done on the mortgage loans.  Hail

21     declaration Exhibit D, release.

22         In the agreement, Assured acknowledged that it was

23     provided with certain "information" which is defined as

24     "certain information and analysis concerning the Soundview

25     transaction including without limitation a report prepared by

E3HCASSC

1    the Clayton group concerning its review of certain of the

2    assets proposed to be included in the transaction."  Release at

3    one.

4         Assured acknowledge that the information may not be

5    accurate or complete and that Assured would conduct its own

6    assessment of the Soundview transaction and agreed to release

7    RBS from claims, "which in any way relate to or arise out of"

8    RBS's disclosure of such information to Assured.  Release at

9    one.

10        "In adjudicating a motion to dismiss, a Court may only

11   consider the complaint, any written instrument attached to the

12   complaint as an exhibit, any statements or documents

13   incorporated in it by reference, any document upon which the

14   complaint heavily relies" and any judicially noticeable

15   matters.  *In re Thelen, LLP, 736 F.3d 213, 219 (2d Cir. 2013).*

16   Moreover, "A plaintiff's reliance upon the terms and effects of

17   a document drafting a complaint is a necessary prerequisite to

18   the Court's consideration of the document on a dismissal

19   motion; mere notice or possession is not enough."  *Chambers*,

20   *282 F.3d at 153*.

21        The release in this case is not a document in which

22   the plaintiff relies, let alone heavily relies in drafting the

23   amended complaint.  The plaintiff also disputes whether the

24   Clayton reports referred to in the amended complaint are the

25   very same due diligence reports at issue in the release.  The

E3HCASSC

1    Court could not revolve that factual dispute on a motion to

2    dismiss, thus, this is not a case in which the plaintiff

3    deliberately avoids attachment of or reference to a document

4    upon and which is integral to the complaint, such as avoiding

5    reference to a contract in a complaint that relies heavily upon

6    the terms and effects of the contract.  *Cf. International*

7    *Audiotext Network, Inc. v. American Tel 62 F.3d 69, 72 (2d Cir.*

8    *1995)*.

9          Therefore, without converting the present motion into

10   one for summary judgment, which neither party has requested,

11   the Court declines to consider the release in adjudicating this

12   motion to demiss.  *See Allen v. Chanel, Inc. No. 12 Civ 6758,*

13   *2013 WL 2413068 at 6 (S.D.N.Y. June 4, 2013);  Maloney v. CSX*

14   *Transportation, Inc, No. 09 Civ. 1074, 2010 WL 681332, at 3*

15   *(N.D.N.Y February 24, 2010)*.

16         The defendants next argue that the plaintiffs have

17   failed to state a claim for fraud.  Under New York law, to

18   state a claim for fraud the complaint must contain allegations

19   of a representation of material fact, falsity, scienter,

20   reliance and injury.  *Small v. Lorillard Tobacco Co, Inc. 720*

21   *N.E.2d 892, 898 (N.Y. 1999)*.  In addition, in alleging fraud or

22   mistake, a party must state with particularity the

23   circumstances constituting fraud or mistake.  Malice intent,

24   knowledge and other conditions of a person's mind may be

25   alleged generally.  Fed. R. Civ. P. 9(b).

49

E3HCASSC

        The defendants do not dispute, for purposes of the
present motion, that the statements in the loan tapes, the term
sheet and the prospectus supplement were materially
misrepresentations, but argue that RBS made no actionable
representation because information in these documents was
provided by WMC, and that RBS merely tendered the information
to Assured.  However, all of these documents bore RBS's name
and/or logos and the plaintiff received them directly from RBS.
Amended complaint paragraphs 46, 50, 55.

        The prospectus supplement makes various statements
representing that the loan originator, WMC, had generally
followed the underwriting guidelines, hail declaration Exhibit
C at S86, which the plaintiff alleges to be false statements by
RBS.  Amended complaint paragraph 55.

        The defendants do not deny authorship of the
prospectus supplement, but argue no fraud claim can arise out
of statements because RBS had disclaimed ownership.  *See Abu
Dhabi Commercial Bank v. Morgan Stanley Co. 888 F. Supp. 2d
431, 451-52 (S.D.N.Y. 2012)*.

        The defendants point to three statements to that
effect.  The first statement states, "The information set forth
in the following paragraphs is based on servicing records and
representations about the mortgage loans that were made by the
originator at the time it sold the mortgage loans."  Hail
declaration Exhibit C at S29.

E3HCASSC

```
 1              However, this disclaimer appears at S29 and does not,
 2      on its face, purport to disclaim authorship of statements on
 3      S86, which is in another part of the document more than 50
 4      pages away.  The second statement appears on page S104 and
 5      provides that "Pursuant to the master agreement, the,
 6      originator made certain representations and warranties
 7      regarding the mortgage loans."  Hail declaration Exhibit C at
 8      S104.  The statement is also not an unambiguous disclaimer of
 9      authorship regarding statements about WMC's loan originating
10      practices on page S86.  Page S85, the documents that, "The
11      information set forth in this section has been provided by WMC
12      Mortgage Corp," Hail declaration, Exhibit C at S85.  Again, it
13      is unclear whether this statement covers the alleged
14      misrepresentations at issue, because the language appears under
15      the subheading "General," below the heading "The Originator,"
16      while the statements on page S86 appear under another
17      subheading, "Underwriting Standards."  Hail declaration Exhibit
18      C at S85 and S86.
19              The disclaimer on page S85 would well mean that the
20      general information about the originator was provided by WMC.
21      The same disclaimer is not repeated under "Underwriting
22      Standards," on page S86.  Thus all of these statements are at
23      least ambiguous as to whether they affectively disclaim
24      authorship over the statements on page S86, on which the
25      plaintiff relies.  Amended complaint paragraph 55.
```

E3HCASSC

1           Viewing with the language in light more favorable to

2     the plaintiff for purposes of present motion the Court cannot

3     find at this stage that RBS did not make the alleged

4     misrepresentations in the prospectus supplement.

5           With respect to the loan tape and the term sheet, the

6     defendants have not pointed to any statement clearly

7     disclaiming RBS's authorship.  The defendants rely on the

8     language in the term sheets stating the information "is

9     preliminary and is subject to completion or change."  That more

10    complete information can be found in certain SEC filings.  Hail

11    declaration Exhibit B at three.

12          However, at this stage of the litigation it is not

13    clear whether that language can be construed to disclaim RBS's

14    authorship of the information provided in the loan tape and the

15    term sheet, if at all.  Contrary to the defendant's argument,

16    the plaintiff's allegation that the information was, in fact,

17    authored by WMC is not a concession that RBS made no

18    misrepresentation.  The amended complaint does not suggest that

19    at the time the policy was issued Assured knew of WMC's sole

20    authorship of the data in the loan tape.

21          Thus, according to the plaintiff, even though RBS

22    allegedly knew that the information contained in the loan tape

23    and the term sheet was materially false, (See amended complaint

24    paragraphs 83, 85, 98, 10000 100-102), RBS transmitted these

25    documents to Assured with RBS's own logo or name attached and

E3HCASSC

without any disclaimer of authorship inside these documents or
in an e-mail transmitting these documents.  With all
ambiguities resolved and inferences drawn in favor of the
plaintiff at this stage of the litigation, the allegations are
facially sufficient to support the assertion that RBS itself
made the representations of the plaintiff by adopting and
holding out the false statements as its own in the loan tape
and the term sheet.  *See Bloom v. Mutual of Omaha Insurance*
*Company, 557 N.Y.S.2d 614, 616 (App. Div. 1990)*; *Weisheit v.*
*Pabst Brewing Co. 168 N.Y.S. 340, 345 (App. Div. 1917)*.

        The defendants next argue that the plaintiff has
failed to make sufficient allegations of scienter.  Under New
York law, scienter or intent to defraud includes not only
knowing statements of falsehood, but also a reckless
indifference to error.  *Burgundy Basin Inn Limited v. Watkins*
*Glen Grand Prix Corp. 379 N.Y.S.2d 873, 879 (App. Div. 1976)*.
*See E*Trade Financial Corp. v. Deutsche Bank AG, 420 F. Supp.*
*2d 273, 289, n.3 (S.D.N.Y. 2006)*.

        Although Rule 9(b) required that circumstances
constituting fraud or mistake may be alleged with
particularity, it also provides that malice intent, knowledge
and other conditions of a person's mind may be alleged
generally.  Fed. R. Civ. P. 9(b).  However, relaxation of Rule
9(b) specificity requirement for scienter allegations is
compensated by the requirement that the plaintiffs must allege

1    facts that give rise to a strong inference of fraudulent

2    intent, which applies to federal securities litigation, as well

3    as state law fraud claims.  *Lerner v. Fleet Bank, N.A. 459 F.3d*

4    *273, 290-91 (2d Cir. 2006); Shields v. Citytrust Bancorp, Inc.*

5    *25 F.3d 1124, 1128 (2d Cir. 1994).*

6              In this case, the plaintiff alleges that RBS knew a

7    large number of mortgage loans it securitized were originated

8    with utter disregard of underwriting standards.  Specifically,

9    the plaintiff alleges that RBS knew that a large number of

10   mortgage loans securitized in the Soundview transaction

11   included in a loan tape were defective.  Moreover, RBS had

12   long-standing dealings with WMC and allegedly knew that the WMC

13   had a corporate culture of disregarding underwriting guidelines

14   in order to generate high volumes of loans for sales to

15   securitizations.  Thus, even if RBS had no actual and

16   affirmative knowledge about each and every defect in the

17   mortgage loans at issue, RBS's tendering of the loan tape, the

18   prospectus supplement and the term sheet was done at least with

19   a reckless disregard of the truth or falsity of the statements

20   which supports an inference of scienter.  *See DaPuzzo v.*

21   *Reznick Fedder 7 Silverman, 788 N.Y.S.2d 69, 70 (App. Div.*

22   *2005*).

23             The plaintiff's allegations are also sufficient to

24   raise a strong inference of fraudulent intent.  The plaintiff

25   alleges that RBS approached Assured for an insurance policy in

E3HCASSC

order to sell the RMBS certificates.  RBS asked Assured to

issue the policy in this case because an investor was

interested in purchasing the entire tranch of class II-A-I

certificates, specifically demanded insurance.  RBS knew that

Assured would rely on the information RBS provided in

determining whether or not to issue the policy, and allegedly

no reasonable monoline insured would have issued the policy if

the insurer knew that information RBS provided was materially

false.

These allegations taken together raise a strong

inference that RBS had a specific motive and intent to deceive

the plaintiff in order to obtain the policy for a specific

transaction.  Therefore, the plaintiff has made sufficient

allegations to support scienter.  *See People ex rel. Cuomo v.*

*H&R Block, Inc. 870 N.Y.S.2d 315, 316 (App. Div. 2009),*

*Houbigant, Inc. v. Deloitte & Touche, LLP, 752 N.Y.S.2d 493,*

*496-97 (App. Div. 2003).*

The defendants next argue that Assured has not

sufficiently alleged reasonable or justifiable reliance.

Although reasonable reliance is often a fact-intensive

question, *DDJ Management, LLC v. Rhone Group, 931 N.E.2d 87,*

*91-92 (N.Y. 2010)*, it is a condition which cannot be met, where

a party has the means to discover the true nature of the

transaction by the exercise of ordinary intelligence and fails

to make use of those means.  *Arfa v. Zamir, 905 N.Y.S.2d 77, 79*

E3HCASSC

1    *(App. Div. 2010) aff'd 952 N.E.2d 1003 (N.Y. 2011)*.   Only when

2    matters are held to be peculiarly within defendant's knowledge

3    is it said that plaintiff may rely without prosecuting an

4    investigation.  Because the plaintiff would have no independent

5    means of ascertaining the truth.  *Crigger v. Fahnestock & Co.*

6    *443 F.d 230, 234 (2d Cir. 2006)*.  Thus, where sophisticated

7    where businessmen engaged in major transactions enjoy access to

8    critical information, but fail to take advantage of that

9    access, New York courts are particularly disinclined to

10   entertain claims of justifiable reliance.  *Grumman Allied*

11   *Industries v. Rohr Industries, Inc. 748 F.2d 729, 737 (2d Cir.*

12   *1984)*.

13           As an initial matter, the defendants again argue that

14   the release precludes the plaintiff from pleading reasonable

15   reliance because in executing the release Assured agreed to

16   make its own independent assessment of merits and risks of the

17   transactions.  See release at one.

18           As explained above, the Court cannot rely on the

19   release in deciding a motion.  Moreover, Assured's

20   acknowledgment that it would conduct an independent assessment

21   does not facially contradict Assured's claim that Assured was

22   defrauded in relying on the data and documents provided by RBS.

23   The scope of the independent assessment that Assured agreed to

24   undertake is also not clear.  Thus, even if the Court were to

25   consider the release, the Court must draw all factual

1  inferences in favor of the plaintiff and cannot conclude at

2  this stage the release precludes Assured from pleading

3  reasonable reliance.

4         The defendants next argue that Assured cannot plead

5  reasonable reliance because Assured possessed the same Clayton

6  due diligence that RBS had, and that allegedly put RBS on

7  notice of the defects in the mortgage loans.  However, the

8  plaintiff does not allege that the Clayton due diligence was

9  the source of information giving rise to RBS's knowledge, but

10  alleges that the due diligence was evidence of RBS's knowledge.

11  Amended complaint paragraph 87.  The plaintiff alleges that RBS

12  routinely overrode the due diligence designation by due

13  diligence firms, such as Clayton.  Amended complaint paragraphs

14  87 to 91.  Thus, without a factual record, the Court cannot

15  determine at this stage that Clayton due diligence rendered

16  Assured's reliance upon reasonable as a matter of law.

17         The defendants then argue that Assured had access to

18  the loan files and should have made its own inquiry.  However,

19  even though Assured eventually did obtain access to the loan

20  files through the beneficial owner of the certificates, it is

21  not clear from the face of the amended complaint that Assured

22  had such access before the policy was issued.  Amended

23  complaint paragraph 72.  Moreover, even if Assured had such

24  access prior to issuing the policy the Court also cannot

25  determine at this stage that Assured's reliance on materials

E3HCASSC

1    provided by RBS was unreasonable as a matter of law.  In light

2    of factors such as the industry's general practice, the amount

3    of work required to conduct independent assessment and the time

4    frame within which Assured was requested to issue the policy.

5    *See CIFG Assurance North America Inc. v. Goldman, Sachs &*

6    *Company, 966 N.Y.S.2d 369, 371 (App. Div. 2013)*.

7            Finally, the defendants argue that reasonable reliance

8    is precluded by the disclosures made in the term sheet and

9    prospectus supplement.  In particular, the prospectus

10   supplement discloses the risks associated with the investment,

11   based on loans made to low credit quality borrowers, the

12   possibility that a borrower made present fraudulent

13   documentation and obtaining the loan, and the market conditions

14   that made the investment risky.  See Hail declaration Exhibit

15   C, prospectus at 13 to 14, 31 to 33 and 48.  However, these

16   disclosures address the inherent risks of the investments and

17   are insufficient to refute allegations that RBS knowingly

18   misrepresented the quality of the loans and the originator's

19   adherence to the underwriting guidelines for the specific

20   loans, included in the Soundview transaction.

21           Similarly, the defendants rely on the disclosure in

22   the prospectus supplement that "a substantial number of the

23   mortgage loans to be included in the trust will represent

24   exceptions" to WMC's underwriting guidelines.  Hail Declaration

25   Exhibit C at S87.  Arguably that this, along with other

1   factors, should have put Assured on notice regarding the

2   alleged fraud.

3           However, the defendants reliance on this language is

4   out of context.  Immediately before the language quoted by RBS,

5   the prospectus supplement reads "The mortgage loans have been

6   either, one, originated generally in accordance with the

7   underwriting guideline established by WMC, or two, purchased

8   generally after reunderwriting, generally in accordance with

9   the underwriting guidelines.  On a case by case basis WMC may

10  determine that based upon compensating factors, a prospective

11  mortgager not strictly qualifying warrants an underwriting

12  exception."  Hail declaration Exhibit C at S86.  Thus, the

13  disclosure that some mortgagers were granted exceptions in good

14  faith after case-by-case evaluations of compensating factors,

15  does not render unreasonable Assured's reliance on the data in

16  the loan tape and the representations regarding WMC's general

17  adherence to the underwriting guidelines.

18          Therefore, based on the facts of the alleged amended

19  complaint, and on the documents allegedly relied upon, the

20  Court cannot determine that Assured's reliance was unreasonable

21  as a matter of law.  Because the plaintiff has pleaded a fraud

22  claim based on misrepresentations, it is unnecessary for the

23  Court to reach the question of whether the plaintiff had

24  sufficiently pleaded fraud based on concealment.  The

25  defendant's motion to dismiss the fraud claim Count One is,

E3HCASSC

therefore, denied.

The plaintiff also brings a claim against all defendants for aiding and abetting fraud.  The defendants move in a footnote to dismiss this claim on two grounds at 24 note 57.  First, the defendants argue that the fraud claim should be dismissed and the aiding and abetting claim is not sustainable without an underlying fraud claim.  This argument is moot because the Court has denied defendant's motion to dismiss the fraud claim.  The defendants also argue the aiding and abetting claim is duplicative because each of the defendants is accused of committing the underlying fraud.  However, at this stage in the litigation, the specific role of each defendant is unclear and the absence of any factual evidence aiding and abetting fraud remains an appropriate cause of action to join all defendants so as to hold them responsible for each other's actions in furtherance of the fraud.  *See Bobash, Inc. v. Festinger, No. 03909/05, 2007 WL 969435, at *4 (N.Y. Sup. Ct. 2007)*.  Accordingly, the defendant's motion to dismiss the claims for aiding and abetting fraud is denied.

Finally, the defendant moves to dismiss the plaintiff's claim under New York insurance law section 3105 arguing that the plaintiff does not seek rescission and, therefore, is not entitled to rescissory damages.  Section 3105 provides that, "No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder, unless such

E3HCASSC

misrepresentation was mater."  New York insurance law section

3105(b)(1).  Parties in this case do not dispute the

availability of rescissory damages as a remedy for a violation

of Section 3105.  See *MBIA Insurance Corp. v. Countrywide Home*

*Loans, 936 N.Y.S.2d 513, 523 (Sup. Ct. 2012),* modified on other

grounds, *963, N.Y.S.2d. 21 (App. Div. 2013); Syncora Guarantee*

*Inc. v. Countrywide Home Loans, Inc. 935 N.Y.S.2d 858, 869-70*

*(Sup. Ct. 2012*).  New York courts have adopted the rationale

behind the rescissory damages articulated by Delaware courts.

See, for example, *MBIA 936 N.Y.S.2d at 523; Syncora, 935*

*N.Y.S.2d at 869-70.*  As the Delaware Court of Chancery has

explained:  "Rescissory damages are an exception to the normal

out-of-pocket measure.  Because such damages are measured as of

a point in time after the transaction, whereas compensatory

damages are determined at the time of the transaction.  As a

consequence, rescissory damages may be significantly higher

than the conventional out-of-pocket damages because rescissory

damages could include post-transaction incremental value

elements that would not be captured in an out-of-pocket

recovery."  *Strassburger v. Earley, 752 A.2d 557, 579 (Del. Ch.*

*2000*).

          In this case, Assured seeks recovery for "all payments

Assured has made and will make pursuant to the policy without

resort to rescission."  Amended complaint paragraph 120.

(Emphasize added).

E3HCASSC

1          Therefore, what Assured seeks in the Section 3105

2     claim is, in fact, forward-looking rescissory damages, not

3     backward-looking compensatory damages, of payments it has

4     already made.

5          Assured attempts to plead a claim for what are

6     rescissory damages, while explicitly declining to seek

7     rescission.  Indeed, Assured stated at the oral argument that

8     it would be prohibited from seeking rescission under the terms

9     of its insurance contract, and does not seek rescission in the

10    complaint.  Assured relies on the appellate division's decision

11    in *MBIA Insurance Corp. v. Countrywide Home loans, 963 N.Y.S.2d*

12    *21 (App. Div. 2013)*, in which the Court held that the statutory

13    language of Section 3105 can mean to allow "recovery of

14    payments made pursuant to an insurance policy without resort to

15    rescission."  Id. at 22.  That language, at most, can be read

16    to support the proposition that Section 3105 allows recovery of

17    rescissory damages.  However, such damages are available only

18    where rescission is warranted, but "impractical."  *Syncora 935*

19    *N.Y.S.2d at 870*.  The appellate division in *MBIA* held in the

20    paragraph immediately following the language quoted by Assured,

21    that rescission is not warranted where "a plaintiff voluntarily

22    give up the right to seek rescission," or whether the plaintiff

23    "does not actually seek rescission."  *MBIA* 963 N.Y.S.2d at 22.

24         The appellate division made clear that a plaintiff

25    should not be permitted to use the very rarely used equitable

E3HCASSC

tool "to reclaim a right it voluntarily contracted away or to
obtain relief it never actually requested." Id.

        Moreover, in circumstances, very similar to those in
this case, the appellate division made it clear that rescission
was not impracticable.  "Impracticability refers to a scenario
in which rescission is impracticable or impossible because the
subject of the contracts sought to be rescinded no longer
exists or is otherwise impossible or impracticable to recover.
Here, rescission is not impracticable in any relevant sense,
rather, it is legally unavailable," Id.

        Assured attempts to distinguish the appellate's
division's decision in *MBIA*, which rejected the availability of
rescissory damages in circumstance very similar to this case.
Assured argues that it is seeking compensatory damages rather
than rescissory damages, but the damages it seeks are, in fact,
the kind of forward-looking damages that are rescissory damages
and that the appellate division rejected in *MBIA*.  It seeks to
avoid the forward-looking consequences of its insurance policy
without actually rescinding the policy, which it concedes it is
unable to do in the terms of the policy and has not sought in
the complaint.

        Moreover, Assured made no argument that rescission is
impracticable, and that rescissory damages is an appropriate
remedy.  Those arguments would be contrary to the appellate
division's decision in *MBIA*.  Therefore, Assured presents no

E3HCASSC

1    argument that rescission is both warranted and impractical to

2    justify awarding rescissory damages.  Accordingly, Assured has

3    failed to state a claim for rescissory damages and the

4    defendant's motion to dismiss the claim for rescissory damages

5    and, indeed, the claim under the insurance law is granted.

6         The Court has considered all of the arguments raised

7    by the parties to the extent not specifically addressed, the

8    apartments are either moot or without merit for the foregoing

9    reason, the defendant's motion to dismiss is denied, in part,

10   and granted, in part.  The clerk is directed to close docket

11   number 17.  So ordered.

12        Therefore, it's time to have a scheduling order.  Time

13   to answer, defendant's time to answer is April 4.

14        How much time for discovery?

15        MR. HAIL:  I'm going to look for discovery first on

16   the subject matter of the release and bifurcating.  I would

17   anticipate a 12(c) motion or something similar in the short

18   term, about the nature of the diligence and the reliance they

19   have on it.  I would think that we ought to set up first

20   discovery on that issue and then merits discovery after we had

21   an opportunity to be heard on what the diligence says and the

22   role it played on the release issues.

23        MR. MAHER:  Your Honor, we waited a long time to

24   commence discovery in this case.  We would like to commence

25   merits discovery on all issues so we can bring all issues to

64

E3HCASSC

1    the Court-attention as soon as possible.  In terms of the

2    timing, I haven't consulted with counsel in terms of how much

3    time they think they would need.

4              MR. HAIL:  We will good for one month on the reliance.

5              MR. MAHER:  We will need at least six months in terms

6    of discovery.  There will be lot of document production and

7    other issue that need to be revolved.

8              MR. HAIL:  That's exactly what we are trying to avoid

9    on the release issue.

10              THE COURT:  I have already expressed some doubts with

11    respect to whether the release is the end of the litigation

12    pass and the difficulty of deciding that on a 12(c) motion.

13    You say maybe you will make a motion for summary judgment.

14    Well, that implies that you introduce affidavits of what was

15    produced, what was relied on.  Inevitably, I would think, that

16    a motion like that would rely on what did the Assured people

17    know, what do the Assured people say that relied on, and you

18    are going to be looking for depositions of the Assured people.

19              MR. HAIL:  That was my suggestion, your Honor.  We do

20    a 12(c) motion, set that up front and consider that.  Or we

21    could bifurcate the discovery.

22              THE COURT:  I don't want depositions to have to be

23    taken twice of the same people.  If you say we will take the

24    depositions of the Assured's people within the next month

25    without getting all of the documents and we won't take them

E3HCASSC

again, that's one thing, I will listen to that.  If you say,

they don't need our depositions, but we are going to take their

depositions and we will take them again -- here is what I will

do.  The defendant's time to answer is April 4.  I will have a

Rule 16 conference after you have had your Rule 26(f)

conference, and after you have had your Rule 26 conference and

you have given me your Rule 26(f) report.  The answer is due on

April 4 and I will have a conference on April 8 at 4:30 p.m.

          MR. HAIL:  Your Honor, I hate to ask, but can we move

it slightly off that.  The 8th and 9th I'm not in town.

          THE COURT:  Could you do it on April 7?

          MR. MAHER:  I think so.  Is that the Monday?

          THE COURT:  I can do it April 10.

          MR. HAIL:  I rather do it on the 7th, if at all

possible.  The morning would be getter for me.

          THE COURT:  I don't know what I will be.

          MR. HAIL:  I will make it work on the 7th.

          THE COURT:  April 7, 4:30 and you should get me your

Rule 26(f) March 28.  In telling me what you want to do with

the case, you have to ask the questions about who is going to

be deposed and are they going to be deposed more than once and

what is schedule is going to be with respect to the production

of documents on both sides, and what you are going to do about

whether there are any BSI issues in the case.  You have to go

through that checklist for BSI for a complex case.  Maybe there

E3HCASSC

1    won't be many disputes in this case.  Plaintiff says six months

2    to complete all discovery.  This is just between individuals.

3    It's not a classism.  It's not a collective.  Individual

4    plaintiff.  The amount of discovery is relatively cabined.

5         MR. HAIL:  It seems like every case starts off that

6    way, that discovery ought to be relatively discreet and

7    complete.

8         THE COURT:  We will try and keep it that way.

9         MR. HAIL:  I'm all in favor of that.  But often it

10   doesn't work out that way.  I don't know if it's six months or

11   not.  I have to talk to my client.  I will work with Mr. Maher.

12        MR. MAHER:  I agree with that.  We want to work with

13   opposing counsel to come up with something reasonable.

14        What I said, your Honor, was at least six months.  But

15   I actually need to confer with my client in term of what's

16   needed.  I think the schedule you set where are conference

17   report is due in 11 days is aggressive.  I'm out the latter

18   part for that week.  I'm out three or four days before the

19   28th.  I would ask for a little more time so we can confer and

20   come up with some reasonable proposal for you in terms of what

21   might work in this case.  I subject pushing those dates back

22   maybe a week.

23        THE COURT:  Fine.

24        I'm happy to do that.  I want to be productive.  We

25   will do the conference on April 15 at 4:30.  You can get me

E3HCASSC

1   your 26(f) reports by April 8.

2            MR. MAHER:  Very well, your Honor.

3            THE COURT:  Both sides can make this case an example

4   of efficient discovery.  Both sides have an interest in doing

5   that.  Good to see you all.

6            (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25